68 F.3d 1141
 64 USLW 2235, 95 Cal. Daily Op. Serv. 8010,
95 Daily Journal D.A.R. 13,793
 Cathy FREESTONE, individually, on behalf of their minor
children and on behalf of all others similarly situated;
Susan Harrington, individually, on behalf of their minor
children and on behalf of all others similarly situated;
Sonya Madrid, individually, on behalf of their minor
children and on behalf of all others similarly situated;
Judith Rogers, individually, on behalf of their minor
children and on behalf of others similarly situated;
Esperanza Laustaunau, individually, on behalf of their minor
children and on behalf of others similarly situated,
Plaintiffs-Appellants,
v.
Charles E. COWAN, Director, Arizona Department of Economic
Security, in his official capacity, Defendant-Appellee.
 No. 93-16697.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 17, 1995.
Decided Oct. 12, 1995.
 
 William E. Morris, Southern Arizona Legal Aid, Inc., Tucson, Arizona, for the plaintiffs-appellants.
 Steven J. Silver, Sherry M. Klein, Mirian M. Yim, Assistant Attorneys General, Phoenix, Arizona, for the defendant-appellee.
 Appeal from the United States District Court for the District of Arizona.
 Before: STEPHEN REINHARDT, THOMPSON and ANDREW J. KLEINFELD, Circuit Judges.
 REINHARDT, Circuit Judge:
 
 
 1
 This case involves a class action brought by custodial parents, primarily mothers, and their children who have been unable to obtain federally required child support enforcement services from the state of Arizona. The class members sued under Sec. 1983 in an attempt to force the state to comply with its federal obligations, under Title IV-D of the Social Security Act, to identify and seek support from "deadbeat dads." The federal courts have splintered on the question of whether a Sec. 1983 action is available to enforce Title IV-D. The district court adopted the reasoning and approach of the Sixth Circuit finding such relief unavailable and granted summary judgment against the plaintiff families. We join the First and Eighth Circuits in holding that Sec. 1983 is available and reverse.
 
 BACKGROUND
 
 2
 As a condition of participating in the federal Aid to Families with Dependent Children (AFDC) program, states are required to adopt a plan for child support enforcement pursuant to Title IV-D of the Social Security Act, and to operate a program in substantial compliance with that plan. 42 U.S.C. Sec. 602(a)(27). The state program must provide a variety of services including establishment of paternity, enforcement of support orders, and parent locator services. The state must provide these enforcement services both to families receiving AFDC and to non-AFDC families that request them. AFDC families must assign their rights to monetary child support to the state; however, the first fifty dollars of any support collected each month is "passed through" to the AFDC family. All money collected on behalf of non-AFDC families is passed on entirely to the family. A large portion of the costs associated with administering a state's Title IV-D program is reimbursed by the federal government.[1]
 
 
 3
 The Secretary of Health and Human Services is responsible for monitoring state compliance with Title IV-D through periodic audits, and may impose penalties in the form of a reduction in AFDC money for noncompliance, ranging from one to five percent. From 1985 until 1991, Arizona failed three audits conducted by the Department of Health and Human Services (HHS). After the first failed audit, Arizona devised a Corrective Action Plan (CAP) which was approved by the Secretary.[2] However, subsequent audits showed that this CAP was not successfully implemented. After the final failed audit, Arizona devised a new CAP. The Secretary approved the 1992 CAP and waived the 1% penalty. At the time the complaint was filed, the CAP was scheduled to expire on March 1, 1993. During this most recent CAP period, Arizona's State Auditor General conducted an internal performance audit of the child support enforcement program and declared it "barely functioning."[3]
 
 
 4
 Appellants are a class of Arizona custodial parents of minor children who qualify for enforcement services under Title IV-D. The class includes both AFDC and non-AFDC families. The five named plaintiffs in this action are Cathy Freestone, Susan Harrington, Sonya Madrid, Judith Rogers and Esperanza Laustaunau. The custodial parents assert that Arizona's child support enforcement administration systematically fails to furnish them with the services mandated by federal law. The original complaint and the appellant's brief recites a litany of abuses to which the named plaintiffs have been subject. The stories told by the five named plaintiffs document a range of administrative abuses extending from simple incompetence and bureaucratic bungling to shockingly callous indifference.[4] The most fortunate of the named plaintiffs appears to be Cathy Freestone.
 
 
 5
 After their divorce, Cathy Freestone's former husband failed to meet his monthly child support obligations. Freestone could not afford private counsel so she turned to Arizona's Department of Child Support Enforcement (DCSE) for collection assistance. Freestone completed the necessary forms to obtain a wage assignment from her ex-husband's employer. A month later, she called DCSE and was told that the case agent was still waiting for information from a section of the Phoenix office. It was only after Freestone volunteered to procure the information herself and submitted it to her case agent that any progress began to take place. Eventually the wage assignment order was filed, but Freestone discovered that during the interim her ex-husband had switched to a higher paying job for a different employer. She then urged DCSE to obtain a valid wage assignment against the new employer and to obtain a modification of the divorce decree for increased child support payments. Once again, DCSE failed to act in a timely manner. Freestone's ex-husband again switched jobs, this time moving to a lower-paying job in an attempt to avoid increased child support obligations. Although DCSE eventually obtained a wage assignment order against his most recent employer, payments have remained sporadic and DCSE has failed to provide periodic notice to Freestone or to explain the continuing irregularities.
 
 
 6
 Compared to the other named plaintiffs, Freestone's frustrating experiences appear to have been relatively mild. Susan Harrington has obtained, at most, meager assistance from DCSE. Harrington has cooperated with DCSE and its predecessor since 1980 in an effort to force her ex-husband to comply with his support obligations for their three minor children. DCSE has repeatedly lost Harrington's case file and only attempts to contact Harrington's ex-husband when she personally tracks him down and provides the agency with his current address and employment information. Often times, when Harrington has managed to find her ex-husband (who at all times resided and worked in Arizona) and inform DCSE of his whereabouts, because of its extraordinarily long delays in taking enforcement action, he successfully relocates and escapes the agency's grasp. In 13 years, DCSE has managed to obtain only two monthly support payments for Harrington.
 
 
 7
 At the farthest end of the spectrum, are the plaintiffs who simply have received no help at all. For example, Sonya Madrid is an AFDC mother of four who has consistently provided DCSE with all the required information and has repeatedly given the agency her nomadic ex-husband's address. Although Madrid believes that over the past 10 years DCSE has obtained some support payments from her ex-husband, she has never received a pass-through payment.
 
 
 8
 Similarly, Judith Rogers unsuccessfully sought paternity establishment assistance from DCSE. Although her child's father has acknowledged paternity and his name appears on her son's birth certificate, Rogers needs a formal declaration of paternity in order to establish a valid child support order. Also, if paternity were legally established, her son would be entitled to payments against his father's social security account. Rogers first applied for DCSE services in 1980. Although the father's whereabouts are known, the agency has failed to establish paternity over a thirteen-year period. Rather, it has managed to lose Rogers' file on multiple occasions, forcing her to reapply for services each time. At the time this action was filed, Rogers' son was a few months away from reaching majority.
 
 
 9
 Because of systematic failures including the failure to procure wage assignment when all information as to the former spouse's current employer and address has been provided by the custodial parent, the failure to disburse collected support payments in a timely manner or to sufficiently account for payments collected, the frequent losses of clients' files thus forcing them repeatedly to re-initiate enforcement procedures and to complete voluminous forms and burdensome paperwork over and over again, and the inexplicable failure to account for or disburse "pass-through" payments, the parents filed this Sec. 1983 action. They seek equitable relief including a declaratory judgment that the current operation of the Arizona Title IV-D program violates federal law, and a permanent injunction enjoining the state from engaging in this pattern and practice of noncompliance and requiring affirmative measures to achieve and maintain substantial compliance with federal law.
 
 
 10
 Defendant Cowan, Director of Arizona Department of Economic Security, filed a motion to dismiss premised on two grounds: 1) a Rule 12(b)(1) dismissal for lack of standing and thus a lack of subject matter jurisdiction; 2) a Rule 12(b)(6) dismissal for failure to state a claim on which relief can be granted. The state attached various exhibits to its motion, including its most recent CAP. Because of the attachments and exhibits, the district court treated the motion as one for summary judgment. The Director raised numerous arguments in support of his motion, only three of which the district court analyzed and ruled on: He argued that the recipients of Title IV-D services are not the intended beneficiaries of the Act; that there are no mandatory requirements upon the state giving rise to enforceable rights under Sec. 1983; and that under the Sixth Circuit Carelli rationale, the Title IV-D auditing scheme precludes an action under Sec. 1983.
 
 
 11
 Rejecting the first two arguments, the district court found, first, that persons in plaintiffs' position are the intended beneficiaries under Title IV-D; and, second, that although there is no clear requirement that every applicant receive prompt Title IV-D services, plaintiffs are entitled to bring the action if the remedy they request increases their chances of receiving the services.
 
 
 12
 Although the district court found that the plaintiffs had rights under Title IV-D that were enforceable in a Sec. 1983 action, it nonetheless granted summary judgment for the defendant. It relied on the Sixth Circuit's Carelli decision which held that Congress had foreclosed relief under Sec. 1983 by adopting a federal auditing system for the child support enforcement program.[5] The court also agreed with Carelli that its ruling was similar to an abstention order. We review de novo and reverse.
 
 ANALYSIS
 
 13
 The parties dispute the proper characterization of the district court's order. The plaintiffs primarily argue that the district court issued an unauthorized abstention order. They argue that the district court's act of "quasi-abstention" runs contrary to Ninth Circuit and Supreme Court authority.[6] Plaintiffs base their characterization of the order on an analogy invoked by Carelli and reiterated by the district court. Although the district court analogized its disposition of the case to an abstention order, it is clear that the basis of its holding was its conclusion that Title IV-D contained a "comprehensive remedial scheme." We read the district court's order as ultimately turning on the question whether a Sec. 1983 action is available to enforce Title IV-D. We now address that question.
 
 I. Availability of a Sec. 1983 Action
 
 14
 It is well settled that Sec. 1983 provides a private cause of action for violations of federal statutes. Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). There are two exceptions to this rule. First, a Sec. 1983 action is unavailable if the statute does not create enforceable rights. In other words, the statutory provision at issue must be intended to benefit the plaintiff. Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 509, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990). Second, a Sec. 1983 action is unavailable if Congress has foreclosed enforcement of the statute in the enactment itself. Id. at 509, 110 S.Ct. at 2517. Generally, this means either that the Act expressly precludes a Sec. 1983 remedy in its provisions, or that the statute creates a remedial scheme that is sufficiently comprehensive to demonstrate congressional intent to preclude a Sec. 1983 remedy. Id. at 520, 110 S.Ct. at 2523.
 
 
 15
 Currently, there is a three-way split of authority as to the availability of a Sec. 1983 action to enforce Title IV-D. This circuit has not previously addressed the question.[7] A few courts have concluded that Title IV-D creates no enforceable rights. See Wehunt v. Ledbetter, 875 F.2d 1558 (11th Cir.1989); Mason v. Bradley, 789 F.Supp. 273 (N.D.Ill.1992); Oliphant v. Bradley, 1992 WL 153637 (N.D.Ill. Feb. 20, 1992) (not reported in F.Supp.). An impressive majority of courts has found that it does. See Carelli v. Howser, 923 F.2d 1208 (6th Cir.1991); Howe v. Ellenbecker, 8 F.3d 1258 (8th Cir.1993); Albiston v. Maine Commissioner of Human Services, 7 F.3d 258 (1st Cir.1993); Monzon v. Martinez, 833 F.Supp. 479 (E.D.Pa.1993); King v. Bradley, 829 F.Supp. 989 (N.D.Ill.1993); Behunin v. Jefferson County Dep't of Social Services, 744 F.Supp. 255 (D.Colo.1990). Of the courts that have found enforceable rights under Title IV-D, apparently only one (other than the district court below) has held that a comprehensive enforcement scheme nonetheless precludes a Sec. 1983 action. See Carelli, 923 F.2d 1208. The remaining courts have found that neither of the two general exceptions to Sec. 1983 availability is applicable to Title IV-D. See Howe v. Ellenbecker, 8 F.3d 1258 (8th Cir.1993); Albiston v. Maine Commissioner of Human Services, 7 F.3d 258 (1st Cir.1993); King v. Bradley, 829 F.Supp. 989; Behunin v. Jefferson, 744 F.Supp. 255. We conclude that this latter group of cases represents the better view, and hold that Sec. 1983 is available for enforcement of Title IV-D.
 
 A. Enforceable Rights
 1.
 
 16
 In Wilder v. Virginia Hosp. Ass'n, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the Court set forth a three-factor test for analyzing whether a particular statute establishes "enforceable rights" which can be vindicated in a private action under Sec. 1983. The question presented in Wilder was whether the Boren Amendment to the Medicaid Act requiring states to reimburse health care providers according to "reasonable and adequate" rates created enforceable rights under Sec. 1983.
 
 
 17
 The Court explained that the "enforceable right" inquiry turns on whether the plaintiff is one of the intended beneficiaries of the statute, whether the statute imposes a binding obligation on the state, and whether the plaintiffs' asserted interest is so "vague and amorphous" as to be "beyond the competence of the judiciary to enforce." Id. at 509, 110 S.Ct. at 2517 (internal citations and quotations omitted).[8] The Court applied this analysis to determine that the Boren Amendment created enforceable rights in health care providers. See also Howard v. City of Burlingame, 937 F.2d 1376, 1378 (9th Cir.1991).
 
 
 18
 Subsequent to the Court's decision in Wilder, the Court revisited the topic of the meaning of "enforceable rights" in Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992). The Court's discussion in Suter is somewhat less hospitable to the concept of enforceable rights than prior cases, and some question exists as to whether the analysis in Suter alters the test set forth in Wilder. See Suter, 503 U.S. at 365, 112 S.Ct. at 1371 (Blackmun, J., dissenting). See also Albiston, 7 F.3d at 262 (noting argument that Suter appears to depart from Wilder ); King, 829 F.Supp. at 992 n. 1 (Suter "casts some doubt on whether the Wilder framework was still valid") (collecting cases).
 
 
 19
 Suter v. Artist M., 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992), involves a Sec. 1983 class action brought on behalf of child beneficiaries of the Adoption Assistance and Child Welfare Act of 1980. The Act requires states to adopt plans regarding foster care and adoption services that, inter alia, ensure that "reasonable efforts will be made" to prevent removal of children from their homes and to facilitate the re-unification of families. 503 U.S. at 351-52, 112 S.Ct. at 1364. One of the central issues in Suter was whether the "reasonable efforts" clause of the Adoption Act can be enforced in a Sec. 1983 action.
 
 
 20
 The Court concluded that the "reasonable efforts" clause does not confer enforceable rights upon the Act's beneficiaries. The Court reasoned that when "reasonable efforts" is read in context, the clause does not itself create binding obligations on the state because no further statutory guidance can be found as to measuring what constitutes "reasonable efforts." Id. at 359, 112 S.Ct. at 1368. The Court also noted that the regulations promulgated under the Act are not specific and do not provide notice to states that a failure to do anything other than submit a plan with stipulated features for Secretary approval is a condition to receive funding. Id. at 361, 112 S.Ct. at 1369. Thus, the Court concluded that "reasonable efforts" simply imposes a "generalized duty on the State, to be enforced not by private individuals, but by the Secretary...." Id. at 363, 112 S.Ct. at 1370.
 
 
 21
 The Court did not explain the impact of its Suter analysis on the Wilder test. Subsequent courts have taken a variety of approaches towards reconciling Suter and Wilder. Compare Albiston, 7 F.3d at 262-64 (making Suter a threshold inquiry) with Howe, 8 F.3d at 1262-63 (synthesizing two cases into a semi-coherent whole). We conclude that Suter represents an elaboration and amplification of the Wilder test rather than an unannounced and unacknowledged departure. It is notable that the Suter majority both cited and relied on Wilder. While the Suter dissent proclaimed the majority's opinion a departure from and a failure to apply precedent, the majority neither acknowledged nor addressed the dissent's argument. We can not conclude that the Court would overrule sub silentio a precedent of such recent vintage. Wilder and Suter are separated by a mere two years. Because the Suter majority's silence in the face of the dissent's accusation strongly suggests that the majority believed that it was not overriding precedent but instead was merely applying settled legal principles, we must conclude that that is exactly what it did. Accordingly, we read Suter as the Court's effort to provide additional guidance on what is a "binding obligation" and when an asserted interest may be deemed "judicially enforceable."
 
 2.
 
 22
 As almost every court to consider the issue has concluded, we hold that Title IV-D clearly meets the three Wilder requirements as amplified in Suter. First, the statutory and regulatory scheme creates binding obligations upon the state. In order to receive AFDC funding, a state must operate a Title IV-D program. Specifically, the state must have an approved plan for child and spousal support and must operate a child support program "in substantial compliance with such plan." 42 U.S.C. Sec. 602(a)(27). At first blush, one might assume that the phrase "substantial compliance" is no more concrete and unambiguous than the "reasonable efforts" phrase found problematic in Suter. However, unlike "reasonable efforts" in the program at issue in Suter, "substantial compliance" does not stand alone. The statute and regulations under Title IV-D provide highly detailed requirements imposing specific duties on the states.
 
 
 23
 The Title IV-D scheme stands in sharp contrast to that in Suter. In Suter, the Court determined that the only affirmative obligation placed on the states by the Act was a requirement that a state have a plan approved by the Secretary containing a list of certain features. 503 U.S. at 357, 112 S.Ct. at 1367. The Court then examined the regulations promulgated under the statute and determined that they imposed no additional obligations. Central to the Court's determination was the observation that the relevant regulations were "not specific, and do not provide notice to the states that failure to do anything other than submit a plan with the requisite features ... is a further condition on the receipt of funds ..." 503 U.S. at 361, 112 S.Ct. at 1369.
 
 
 24
 The same is not true with regard to Title IV-D. Both the statute and regulations establish clear requirements upon the state regarding the administration of a Title IV-D program. For example, 42 U.S.C. Sec. 654 sets out at length the specific provisions which must be included in a state plan for child and spousal support. A small sampling of these mandatory provisions include: a requirement that the state will establish the paternity of children born out-of-wedlock to AFDC recipients [Sec. 654(4)(A) ]; provide periodic notice to families of the amount of support collected on their behalf based on a specified schedule ranging from a monthly to a quarterly basis [Sec. 654(5) ]; establish a service meeting designated requirements to locate absent parents [Sec. 654(8) ]; provide that the state will adhere to the administrative regulations established to ensure an effective program for locating absent parents, establishing paternity, obtaining support orders, and collecting support payments [Sec. 654(13) ]; provide that the state establish procedures for procuring delinquent child support payments from tax refunds [Sec. 654(18) ]; provide that the state regularly and frequently publicize the availability of child support enforcement services [Sec. 654(23) ].
 
 
 25
 But more than identifying specific provisions to be included in a state plan for its child support enforcement program, the statute also sets forth explicit administrative procedures that a state must establish and implement to ensure the effectiveness of its program. See 42 U.S.C. Sec. 666. A small sample of these include procedures for garnishment of wages, garnishment of state tax refunds, imposition of liens against real and personal property for delinquent support, and for establishing a series of presumptions and requirements related to genetic testing for paternity determinations.
 
 
 26
 Finally, the statute also sets forth detailed criteria for measuring compliance with the statute. For example, 42 U.S.C. Sec. 652(g) establishes performance standards for state paternity establishment programs. The baseline performance standard established in 75%, and the statute sets out a formula for calculating this percentage based on the total number of out of wedlock births during a fiscal year.
 
 
 27
 Although the Title IV-D statute itself is highly detailed, the regulations promulgated under the statute provide even more specificity. In 45 C.F.R. Sec. 303, the Secretary has set forth very specific and detailed regulations regarding standards for individual states' Title IV-D program operation. For example, the regulations lay out a step-by-step process to be followed when attempting to locate absent parents and their income or assets. See 45 C.F.R. Sec. 303.3. These steps include examining all appropriate location sources within 75 calendar days of determining location is needed,[9] referring appropriate cases to the Title IV-D agencies of other states, and repeating location attempts quarterly or immediately upon receipt of new information.
 
 
 28
 The regulations also set forth highly detailed and specific procedures (including time limits, methods, and resources to use) regarding the establishment of support obligations, establishment of paternity, enforcement of support obligations, provision of services in interstate IV-D cases, review and adjustment of child support orders, and case closure criteria. Reading both the statute and the regulations, states have a clear indication of the terms of the bargain they are entering into when they agree to accept AFDC funds.
 
 
 29
 In sum, it is not simply the use of the phrase "substantial compliance" that creates enforceable rights. Our conclusion that the right is enforceable results in large measure from the fact that the state is required to provide specified services which meet a specified quantitative standard. The statute and the regulations set out in explicit detail the type of services to be rendered and the standards by which those services will be measured. "Substantial compliance" is simply a short hand way of setting forth a standard that the state must meet. The state can meet this standard only by satisfying the concrete requirements which are specified in the statutory and regulatory scheme.
 
 
 30
 Second, plaintiffs' asserted interest is not vague or amorphous, and it is sufficiently concrete to be judicially enforceable. The provision of specified services in compliance with a defined plan gives rise to a judicially enforceable interest. The statutes and regulations clearly set out what services are to be provided and by what standards a program is to be evaluated. The core services mandated by federal law are paternity location, paternity establishment, establishment of child support orders, and child support collection. Whether a state's program provides those services and whether plaintiffs are receiving to those services to the degree required by law is judicially ascertainable.
 
 
 31
 Finally, the statutory language and legislative history show that Title IV-D is intended to benefit needy families with children.[10] See Howe, 8 F.3d at 1262. As the Howe court noted, the first section of Title IV-D sets out several purposes for the enactment including: "enforcing the support obligations owed by absent parents ... and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for [AFDC] for whom such assistance is requested...." 42 U.S.C. Sec. 651. The relevant congressional committee report states:
 
 
 32
 The Committee believes that all children have the right to receive support from their fathers. The Committee bill ... is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup.
 
 
 33
 S.Rep. No. 93-1356 reprinted in 1974 U.S.C.C.A.N. 8133 at 8146. Although the same report makes note of the financial benefits that would accrue to the government if more absent parents supported their children, Congress realized that one of the more important interests vindicated by this Act was the rights of children:
 
 
 34
 The Committee believes that an AFDC child has a right to have its paternity ascertained in a fair and efficient manner unless identification of the father is clearly against the best interests of the child. Although this may in some cases conflict with what a social worker considers the mothers' short-term interests, the Committee feels that the child's right to support, inheritance, and to know who his father is deserves the higher social priority.
 
 
 35
 Id. at 8154-55.
 
 
 36
 Thus, we agree with the overwhelming weight of authority recognizing that Title IV-D was intended to benefit needy families, and particularly children. See Howe, 8 F.3d at 1262 (collecting cases).
 
 3.
 
 37
 Although we find it quite clear that Title IV-D creates enforceable rights in families in need of Title IV-D services, there is some question as to the contours of those rights. The state argues that the most plaintiffs are entitled to is "substantial compliance." Under this reasoning, so long as the state meets the 75% requirement, no plaintiffs may sue, even if they fall within the 25% of cases not being serviced. See King, 829 F.Supp. at 994.
 
 
 38
 In contrast, the plaintiffs contend that the 75% simply establishes the minimum requirement for funding without penalty, but that in some areas, at least, 100% compliance is mandatory. They further argue that Sec. 303 of the regulations sets forth the efforts that must be taken in each and every case. In support of their arguments, plaintiffs primarily rely on Withrow v. Concannon, 942 F.2d 1385 (9th Cir.1991).
 
 
 39
 In Withrow, a class comprised of applicants for and recipients of AFDC, Food stamps, and Medicaid sued Oregon officials seeking declaratory and injunctive relief compelling the defendants to hold hearings in compliance with federally prescribed time limits. The district court granted summary judgment in favor of the state officials on the ground that they had substantially complied with the applicable federal regulations. We reversed, reasoning that "substantial compliance" was simply a standard for termination of federal funding and was not an appropriate standard for defining the rights of the relevant beneficiaries. 942 F.2d at 1387. We explained that the funding standard was not a measure of what the regulations require but rather a measure of when a failure to meet those regulations had reached sufficient magnitude to trigger a funding cessation. Id. In order to determine precisely what the regulations required, we reasoned, one must look to the language of the regulations themselves. We pointed to the unequivocal language of the regulations that imposed mandatory requirements and stated:
 
 
 40
 From the standpoint of the applicants or recipients who are denied hearings and decisions within the time mandated by federal regulations, it is not comfort to be told that there is no federal remedy because the state is in "substantial compliance" with federal requirements.
 
 
 41
 Id. at 1387.
 
 
 42
 Plaintiffs argue that the Sec. 303 regulations promulgated under Title IV-D are analogous to the regulations in Withrow and that Withrow is controlling. They point out that the regulatory language is equally mandatory and unequivocal in both cases. Defendants attempt to distinguish Withrow on the basis that Withrow involved basic subsistence rights not at issue here. We do not agree that Withrow can be so easily distinguished, but we need not decide that point here. The question whether federal law precludes an individual remedy during periods in which the state is in "substantial compliance," although an interesting one, is not before us. The district court made no factual findings as to the level of Arizona's compliance but rather disposed of this case on the legal ground that a Sec. 1983 action is generally unavailable in Title IV-D cases. It is only the latter proposition that we consider here. Accordingly, the state's representations at oral argument regarding the improvements in certain core functions of its program are simply irrelevant to the issue before us.
 
 B. Congressional Foreclosure of Enforcement
 
 43
 The district court based its conclusion that Title IV-D contains a remedial scheme sufficiently comprehensive as to foreclose a Sec. 1983 remedy on the Sixth Circuit's decision in Carelli.[11] Carelli, like the present case, involved a class of custodial parents who sued the responsible state officials for injunctive relief in a Sec. 1983 action challenging their administration of the state's child support enforcement services. On interlocutory appeal from the district court's denial of their motion to dismiss, the state officials made two arguments: first, that the plaintiffs were not the intended statutory beneficiaries; and second, that Congress had foreclosed private enforcement through the enactment of a comprehensive auditing scheme.
 
 
 44
 The Carelli court rejected the first argument because the legislative history showed that one of the classes of intended beneficiaries was needy families with children. 923 F.2d at 1211. However, it ruled for the defendants on the second argument holding that the statute contained a comprehensive remedial scheme foreclosing a Sec. 1983 action. In reaching this conclusion, the court pointed to the audit provisions and detailed performance criteria, and the fact that the statute and regulations had been amended several times, thus demonstrating "fine tuning." Because the state had failed two audits, been subject to a penalty, and was implementing a new Corrective Action Plan, the court characterized plaintiffs' action as an attempt to seek a " 'hurry-up' order from the federal court." Id. at 1215. The court concluded that it was unconvinced that "congress intended the federal judiciary to occupy the same ground at the same time and in the same manner as the secretary...." Id. at 1216. The court also noted that the plaintiffs could each seek individual relief through private suits to enforce support orders and establish paternity.
 
 
 45
 Unlike all the other courts that have considered the comprehensive enforcement scheme argument, the district court in the case now before us agreed with and adopted the Carelli court's rationale. However, an examination of the cases in which the Supreme Court has discussed the issue shows that the Title IV-D audit and penalty scheme fall far short of the "sufficiently comprehensive" requirement.
 
 
 46
 Middlesex County Sewerage Authority v. National Sea Clammers, Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), established the "sufficiently comprehensive" exception to Sec. 1983 actions. In Sea Clammers, the Court found that the Federal Water Pollution Control Act (FWPCA) contained such an exhaustively comprehensive enforcement scheme that congress necessarily must have intended to foreclose a Sec. 1983 cause of action. 453 U.S. at 13-14, 101 S.Ct. at 2623. The scheme consisted of elaborate enforcement provisions including authorization for governmental bodies to seek civil and criminal penalties, the right of any interested person to seek judicial review of agency action, and two separate citizen suit provisions.
 
 
 47
 Since Sea Clammers was decided, few statutes have been found to contain such a preclusive enforcement scheme, and the exception is viewed as a narrow one. The Court has often warned that it "will not lightly conclude that congress intended to preclude reliance on Sec. 1983 as a remedy for the deprivation of a federally secured right." Wright, 479 U.S. at 423-24, 107 S.Ct. at 770. In fact, in only two cases has the Supreme Court found such a comprehensive scheme to exist. The first was Sea Clammers itself, and the second was Smith v. Robinson, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). A central feature of both of these statutory schemes was the inclusion of express private remedies allowing citizens to compel state action. Title IV-D contains nothing akin to a separate private remedy.
 
 
 48
 Most pertinent to the present case, a remedial scheme that closely tracks the Title IV-D scheme has previously been deemed insufficiently comprehensive to foreclose Sec. 1983 action. In Wright v. Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), tenants living in low-income housing projects owned by the city housing authority brought a Sec. 1983 suit alleging that the authority overbilled them for their utilities in violation of the rent ceiling imposed by the Brooke Amendment to the Housing Act. The Court reversed the court of appeals decision that the administrative scheme providing for enforcement by HUD foreclosed private enforcement. The Court found that agency's power to audit, enforce contracts, and cut off federal funds constituted "generalized powers" insufficient to foreclose Sec. 1983 remedies. 479 U.S. at 428-30, 107 S.Ct. at 773.
 
 
 49
 The sufficiency of audits and fiscal penalties as a remedial scheme could not have been more clearly rejected. Specifically, the Court stated: "Neither, in our view, are the remedial mechanisms provided sufficiently comprehensive and effective to raise a clear inference that congress intended to foreclose a Sec. 1983 cause of action...." 479 U.S. at 425, 107 S.Ct. at 771 (emphasis added). See also Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 1222, 25 L.Ed.2d 442 (1970) (rejecting argument that a federal court is without power to review state plan because the Department of Health, Education and Welfare (HEW) had power to cut off federal funds for noncompliance with statutory requirements; Court reasoned "We are most reluctant to assume Congress has closed the avenue of effective judicial review to those individuals most directly affected by the administration of its program").
 
 
 50
 The reasoning in Carelli is completely inconsistent with that in Wright, and Carelli did not attempt to distinguish the Supreme Court's discussion in that case. The Secretary here has no more power than HUD possessed in Wright. All HHS can do is audit and reduce AFDC funding. Moreover, the Wright Court explicitly rejected the argument subsequently adopted by Carelli that plaintiffs have other state court remedies. The Wright Court reasoned that "the state-court remedy is hardly a reason to bar an action under Sec. 1983, which was adopted to provide a federal remedy for the enforcement of federal rights." 479 U.S. at 429, 107 S.Ct. at 773.
 
 
 51
 In addition to this compelling and binding Supreme Court authority, an examination of Ninth Circuit cases where a remedial scheme was found to be sufficiently comprehensive shows that the Title IV-D scheme is meager by comparison.
 
 
 52
 In Almond Hill School v. USDA, 768 F.2d 1030 (9th Cir.1985), the plaintiffs sought an injunction to halt pesticide spraying in their area under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA). Plaintiffs claimed that the pesticide project violated labeling provisions of FIFRA.
 
 
 53
 In finding that the enforcement scheme of FIFRA was sufficiently comprehensive, the court pointed to: the administrative and judicial enforcement procedures; administrative power to impose civil penalties against violators; criminal sanctions for intentional violations; express authorization to EPA Administrator and Attorney General to seek injunctive relief; an elaborate administrative review procedure and express provision for review of agency decision in district court or court of appeals; and procedures by which interested persons can file complaints with the Administrator to challenge particular use of pesticide. See 768 F.2d at 1035-38.
 
 
 54
 When compared to the factors identified in Almond Hill, the Title IV-D enforcement scheme is paltry indeed. Although the statutes and regulations set forth highly detailed performance and audit criteria that states must comply with in order to "substantially comply" with federal law, the remedies for failure to "substantially comply" are neither similarly detailed nor specific. If a state fails to substantially comply, it is subject to increased monitoring. Rather than the statutorily prescribed three year audit, the state must be audited annually. If the state repeatedly fails the audits, the Secretary may reduce AFDC funding. This penalty ranges from one to five percent depending on the duration of noncompliance. There are no other provisions for administrative enforcement.
 
 
 55
 Moreover, there are no provisions for judicial enforcement. This complete lack of judicial enforcement strongly supports the conclusion that the Title IV-D enforcement scheme falls short of what is required to foreclose a Sec. 1983 action. In Keaukaha-Panaewa Community v. Hawaiian Homes, 739 F.2d 1467 (9th Cir.1984), we noted that the Hawaiian Admissions Act provisions provided no private administrative or judicial remedies, but simply gave the federal government the right to sue. We concluded that this single public remedy could not foreclose a private Sec. 1983 remedy. 739 F.2d at 1471. See also Wright, 479 U.S. at 426-27, 107 S.Ct. at 772 (noting that provisions for private judicial remedies evidence congressional intent to supplant a Sec. 1983 remedy). If the presence of a public judicial remedy without a corresponding private remedy is insufficient to make an enforcement scheme "sufficiently comprehensive," then it would seem clear that a bar does not arise when the statute contains no judicial enforcement provision at all.
 
 
 56
 Under Almond Hill, it is also necessary to consider whether a Sec. 1983 remedy would be inconsistent with the statutory remedies. Private enforcement here would not undermine existing statutory mechanisms because the HHS auditing scheme would not be interrupted. In fact, private enforcement may actually enhance effectiveness of the reduction penalty by giving states a greater incentive to comply with federal law. Unlike a small monetary penalty that decreases the amount of funds available for AFDC recipients, the contempt power of the court, as well as other traditional equitable remedies, is likely to be more successful in inducing compliance on the part of state officials, and where necessary, state legislators. Thus, the availability of private actions supplements the investigatory and enforcement power of HHS.
 
 
 57
 Our conclusion is the same as that reached by the First and Eighth Circuits. Both Howe and Albiston were decided after the district court issued its order here and both courts soundly rejected the rationale invoked in Carelli.
 
 
 58
 In Howe v. Ellenbecker, 8 F.3d 1258, 1263 (8th Cir.1993), the court reasoned that "Title IV-D does contain an enforcement scheme in the form of fiscal sanctions the federal government may assert against the state, but these remedial measures are neither comprehensive nor available to the class. The federal government's authority to audit and impose monetary sanctions does not constitute 'comprehensive' remedies." Id. The Howe court relied directly on Wright for its conclusion.
 
 
 59
 Albiston involved a class of AFDC recipients who brought a Sec. 1983 action to compel the timely disbursement of pass-through and gap payments as required by Title IV-D and Title IV-A regulations.[12] The Albiston court expressly rejected the Carelli conclusion that the administrative enforcement scheme precludes Sec. 1983 private actions. The court noted that "the Supreme Court repeatedly has held that administrative enforcement schemes must be presumed to parallel the private Sec. 1983 enforcement remedy, rather than to 'occupy the same ground' as the state contends." 7 F.3d at 269 (original emphasis).
 
 
 60
 The Albiston court invoked a rationale similar to this court's earlier reasoning in Withrow. Indeed, the court specifically cited Withrow noting:
 
 
 61
 In our view, the OCSE administrative enforcement scheme, authorizing penalties against participating states for "substantial noncompliance," seems intended to protect important federal interests, including prompt disbursement of federal funds to needy AFDC recipients as mandated by Congress, by ensuring that overall performance by the participating State does not fall below federally-prescribed levels. The private remedy afforded by Sec. 1983, on the other hand, safeguards the individual AFDC recipient's interests in the timely receipt of the mandated federal benefits.
 
 
 62
 7 F.3d at 269 (original emphasis).
 
 
 63
 Again, the state argues that such a rationale is somehow distinguishable from the present case because Albiston involved important property interests not at stake here. We reject this distinction. First, it is factually incorrect. The plaintiff class here sets forth a plethora of alleged violations. The allegations include the failure to disburse pass-through payments and the mishandling of support payments collected on behalf of non-AFDC recipients. These allegations implicate concrete property rights.
 
 
 64
 Second, the other "non-property" interests implicated by the class allegations are no less important or deserving of legal protection. Congress has seen fit to deem these individual interests worthy of federal protection, and we are not in a position to second-guess this congressional judgment. Section 1983 protects statutory rights. Although some statutory rights may have a traditional property aspect, statutory rights without that aspect are certainly entitled to no less protection. Without attempting exhaustively to catalogue all of the non-property interests that Congress sought to vindicate through the statutory scheme, we simply note that it is peculiarly within Congress' prerogative to deem particular interests worthy of protection and whether or not an interest has a property aspect is irrelevant for determining whether Congress has created a comprehensive enforcement scheme to protect it.
 
 
 65
 For example, the allegations related to paternity establishment clearly implicate an interest Congress was determined to protect. Congress explained the importance of paternity establishment separate and apart from the opportunity to gain money and other financial support. As explained in the Committee report, a "child's right to support, inheritance, and to know who his father is deserves the higher social priority." S.Rep. No. 93-1356 reprinted in 1974 U.S.C.C.A.N. 8133 at 8155. For more than 13 years, plaintiff Rogers has sought assistance in establishing legal paternity for her son, to no avail. Her son has continuously been deprived of an interest Congress singled out for vindication. The fact that OCSE can audit Arizona's paternity services, identify the deficiencies, impose and subsequently waive a 1% penalty, and continue to periodically monitor the state's program, provides no redress for young Rogers' 13-year journey through familial limbo nor does it adequately prevent similar experiences from recurring. Moreover, the administrative process, according to plaintiffs, has had virtually no effect on improving Arizona's services.
 
 
 66
 Carelli catalogued the detailed provisions of the Title IV-D auditing scheme and equated them with a detailed remedial scheme. However, the purpose of auditing is to evaluate and reveal problems. Auditing leads to the development of corrective action plans. A corrective action plan identifies the steps the state should take in order to bring itself closer to substantial compliance. Auditing and corrective action plans are not themselves remedies.
 
 
 67
 The only administrative mechanism that truly falls into the "remedial" category is the penalty provision--the scale by which states' federal funding is incrementally reduced for failure to substantially comply. At best, this can be characterized as a "public remedy." When closely scrutinized, one realizes that such a remedy fails to satisfy the same needs as a private remedy. As plaintiffs point out, a fiscal penalty on the state fails to vindicate the interests of the statutory beneficiaries; in fact, it serves to reduce funding that would otherwise be available to those members of the plaintiff class who are AFDC recipients. Moreover, the "penalties" here are not inherently remedial in nature. A state may "rationally" decide that it is less expensive to lose the 1 to 5% AFDC funds than to make the necessary expenditures to meet the federal requirements. In any event, the state's legal options in this case are limited to two: 1) it may accept federal funds and comply with the conditions attached to them; or 2) it may opt against participating in the program at all. Arizona has elected to participate in the AFDC program, and accordingly, it must fulfill its part of the contract. It cannot simply extract benefits while reneging on its concomitant obligations. See Rosado, 397 U.S. at 425, 90 S.Ct. at 1225 (Douglas, J., concurring) ("As long as a State is receiving federal funds [ ] it is under a legal requirement to comply with the federal conditions placed on the receipt of those funds.").
 
 
 68
 The Carelli court justified its holding by relying on Supreme Court dissents in Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) and Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). On the basis of these dissents, the court reasoned that utilizing Sec. 1983 to enforce statutory rights against states undermines federalism principles and intrudes on state sovereignty. Although the Carelli court's philosophical concerns may be shared by some commentators, the continued vitality of the majority opinions in Thiboutot and Pape has not been called into question.[13] The availability of a Sec. 1983 action to enforce statutory rights is well settled. Given our responsibility to enforce congressional legislation and to respect binding Supreme Court authority, there can be no legitimate question as to the conclusion we must reach in this case.
 
 II. Equitable Power of the Court
 
 69
 Both in their briefs and at oral argument, the defendants offered an alternative basis for affirming the district court. They argued that the district court's order can be characterized as a determination that equitable relief was unwarranted on the facts of this case. Rather than ruling that a Sec. 1983 action is unavailable for Title IV-D violations, the state contends that the district court simply exercised its broad discretion to conclude that the facts of this case do not warrant issuance of an injunction at this time. Under the state's view, the factors counseling against an injunction are the federal agency oversight process, the state's commitment to improve Title IV-D services as evidenced by its recent correct action plan, and HHS's approval of that plan.
 
 
 70
 We have serious doubts that the factors cited by the state would justify the withholding of judicial discretion.[14] Equally important, however, the district court's order is wholly inconsistent with the construction the state would have us give to it. Accordingly, we unqualifiedly reject the state's argument. The district court expressly relied on Carelli to justify its decision. Carelli explicitly rests on the conclusion that a Sec. 1983 action is precluded by the Title IV-D enforcement scheme. Moreover, the district court directly referred to this Sec. 1983 analysis in its description of Carelli. See Order at 7. Additionally, the only way the district court could have reached the issue of the appropriateness of injunctive relief was to have first decided that the plaintiffs had a valid cause of action. Such a conclusion is clearly inconsistent with its references to and reliance on Carelli.
 
 
 71
 We express no opinion as to the ultimate necessity of the issuance of an injunction on remand. We reverse based solely on the basis of our legal conclusion that a Sec. 1983 action is available to class plaintiffs. We also note that plaintiffs requested more than an injunction. They also requested declaratory relief. The grant of declaratory relief and injunctive relief may require two separate inquiries. We express no opinion as to the appropriateness or inappropriateness of either.
 
 CONCLUSION
 
 72
 The district court's order granting summary judgment to the defendants rests on the erroneous conclusion that a Sec. 1983 remedy for Title IV-D violations is unavailable to plaintiffs. Because Title IV-D creates enforceable rights in the plaintiff class and because the statute does not contain an enforcement scheme sufficiently comprehensive to preclude a Sec. 1983 action, the district court erred in granting defendants judgment as a matter of law.
 
 
 73
 REVERSED and REMANDED.
 
 KLEINFELD, Circuit Judge, dissenting:
 
 74
 I respectfully dissent.
 
 
 75
 Congress lodged power in the Secretary of Health and Human Services, and qualified that power by requiring the Secretary to negotiate with the state governments regarding the terms of its exercise. There is nothing in the law to prevent Governors, Senators and Representatives from telephoning the Secretary to discourage her from overzealous enforcement, which in their view would take too much money away from other important applications.
 
 
 76
 By creating a private right of action, the majority transfers the power to calibrate the intensity of enforcement efforts from political officials to federal judges. Unlike the Secretary, their decisions cannot be made in a political process, informed by considerations of cost, benefit, and competing claims for money. The people who are to be heard in district court are the lawyers for the parties, not elected officials. Transferring decision making power to the judiciary would be appropriate if there were some law to be enforced for the benefit of a claimant. But there is not. The law at issue says, in substance, that states are supposed to try pretty hard, and do a pretty good job, of enforcing child support, and come up with a plan to try harder if the Secretary thinks they have not been trying hard enough.
 
 
 77
 What this lawsuit seeks to accomplish is to lodge the power to decide if the states are trying hard enough, and whether their plans to try harder are good enough, in federal judges instead of the Secretary of Health and Human Services. That is contrary to what Congress did. If plaintiffs win the injunction they seek, then probably the district judge will, if the case is handled like many agency continuing injunction cases, appoint a standing master to supervise enforcement. The master will recommend to the district judge how many attorneys and investigators the attorney general should hire and how rapidly the assistant attorneys general should conclude each step of a case. The state will be required to spend however much money it costs to do what the district court decides would achieve "substantial compliance."
 
 
 78
 The district judge, unlike the state legislature, will not be balancing the child support enforcement unit's requests for money against the requests for money of all the other state agencies. Nor will the judge consider taxpayers' preferences for keeping more of their money. The judge's audience will be the legal services lawyers, the assistant state attorneys general, and the judges on our court. That is a different audience, presenting different pressures and incentives, from the elected officials of the state, the federal officials, and the state electorate.
 
 
 79
 Our analytic task is to reconcile Suter v. Artist M., 503 U.S. 347, 348-54, 112 S.Ct. 1360, 1363-65, 118 L.Ed.2d 1 (1992), with Wilder v. Virginia Hospital Association, 496 U.S. 498, 500, 110 S.Ct. 2510, 2513, 110 L.Ed.2d 455 (1990), and apply the principles of those cases to the statute in this case. In Suter, Congress had provided for federal reimbursement to state foster care and adoption programs. A class action claimed that the state was not making reasonable efforts to prevent removal of children from their families and reunite families after children had been removed, because not enough caseworkers were assigned. The district court, on behalf of the private claimant class, enjoined the state to assign a caseworker to each child within three working days, and the court of appeals had affirmed. Suter, 503 U.S. at 348-54, 112 S.Ct. at 1363-65 (1992).
 
 
 80
 The Supreme Court reversed in Suter, on the ground that private individuals had no right to sue for enforcement of the statute. Id. at 363, 112 S.Ct. at 1370. The Court assumed that the children were intended beneficiaries of the statute. Id. at 357, 112 S.Ct. at 1367. The Court held that the "reasonable efforts" standard in the act did not "unambiguously confer" enforceable rights. Even if the statutory enforcement mechanism were not so comprehensive as to allow no room for private remedies, the scheme "does not make the reasonable efforts clause a dead letter" without a private remedy. The states had no statutory duty to do anything more than submit a plan for approval of the Secretary of Health and Human Services. Id. at 359-62, 112 S.Ct. at 1368-69.
 
 
 81
 Our case is like Suter. The "substantial compliance" standard does not "unambiguously confer" enforceable rights on any individual. The federal standards are for such matters as rates of identification of noncustodial parents of illegitimate children and ratios of staff to caseload in state agencies.[1] Congress, by the use of the word "substantial," expressly provides that enforcement need not be 100%. The formulas in the statute and regulations are exceedingly complex, but generally provide for percentages, such as 75%, and say that if the state does what it is supposed to do 75% of the time, that is good enough. See 42 U.S.C. Secs. 602(a)(27), 652(g); 45 C.F.R. Sec. 305.20(d)(2). The number and elaborateness of the provisions necessarily makes the decision about whether compliance is "substantial" a highly discretionary one. See 42 U.S.C. Sec. 652(g)-(h); 45 C.F.R. Secs. 305.21, 305.24, 305.98. No custodial parent can say, under this statute, "Congress gave me a right to have the state do something in my case which it is failing to do." Even if the state substantially complied, one out of four custodial parents would find herself or himself within the unfortunate 25%.
 
 
 82
 Our case is also like Suter in that the statute does not become a "dead letter" without private enforcement. The Secretary has the power to take away enormous amounts of money from states which do not do what she says. It is also like Suter in that Congress provided that even if the state is not in "substantial compliance," it need not achieve "substantial compliance" to keep the money. The state need only satisfy the Secretary that its "corrective action plan" is "sufficient to achieve substantial compliance." 42 U.S.C. Sec. 603(h); 45 C.F.R. Sec. 305.99. The State governments have no reason to suppose, from the text of the statute, that they have to satisfy federal judges as well as the Secretary of Health and Human Services with their child support collection procedures, or else lose AFDC money.
 
 
 83
 Wilder is not like the case at bar. In Wilder, the federal money at issue was going to private health care providers, not, as in the case at bar, to state governments. Wilder, 496 U.S. at 500, 110 S.Ct. at 2513 (1990). Congress said that the amount had to be "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." Id. (citing 42 U.S.C. Sec. 1396a(a)(13)(A)). The Virginia Hospital Association sued for an injunction to require higher rates, claiming that they were being paid too little money per day. If they won, the practical effect, unlike the case at bar, would be that the plaintiffs would get more money.
 
 
 84
 The Supreme Court held in Wilder that the health care providers could sue for enforcement under section 1983, because they were a class meant to be benefitted by the statute, and the right was not so "vague and amorphous such that it is beyond the competence of the judiciary to enforce." Wilder notes that lack of a private remedy would render the scheme "essentially meaningless," "a dead letter" Id. at 509-15, 110 S.Ct. at 2517-20 (internal quotations omitted); cf. Suter, 03 U.S. at 359-61, 112 S.Ct. at 1368-69 ("absence of a remedy to private plaintiffs under Sec. 1983 does not make the reasonable efforts clause a dead letter"). The Secretary had "limited oversight," so would not be assuring that the rates were adequate. The state administrative procedure allowed health care providers to challenge only their individual payments, not the method by which the rates were determined. These limitations would make the statutory rate standard, "reasonable and adequate to meet the costs," a "dead letter" if the private right of action were not allowed. Id.
 
 
 85
 Evidently legal services offices around the country have been bringing test cases like the one at bar in numerous circuits, and have won some and lost some. The Eleventh and Sixth Circuits have held that the statute does not create a private cause of action. Wehunt v. Ledbetter, 875 F.2d 1558 (11th Cir.1989); Carelli v. Howser, 923 F.2d 1208 (6th Cir.1991). The First and Eighth Circuits have found a private cause of action. Albiston v. Maine Commissioner of Human Services, 7 F.3d 258 (1st Cir.1993); Howe v. Ellenbecker, 8 F.3d 1258 (8th Cir.1993).
 
 
 86
 The First Circuit case, which held that there was a private right of action, is like Wilder and unlike the case at bar in a significant way. The section at issue in Albiston entitles custodial parents on welfare to "prompt payment" of the first $50 of each child support payment the state collects from the noncustodial parent. 42 U.S.C. Sec. 652(i). The Secretary defined "prompt payment" as payment within 15 days. 45 C.F.R. Sec. 302.32(f)(2). Maine was taking two to six months to send the custodial parents their $50 checks. The court held that the custodial parents had standing to sue the Maine Commissioner to get their $50 pass through payments. The First Circuit found that a different statute did not give rise to a private right of action, where the duties it imposed were on the Secretary to make the states do a good job, rather than on the states, a situation more analogous to the case at bar. Stowell v. Ives, 976 F.2d 65 (1st Cir.1992).
 
 
 87
 Albiston is like Wilder in that there was (1) a standard capable of judicial application, (2) a law benefitting the individuals bringing the lawsuit, and (3) the claim by their lawyer would cause money to which they were entitled to be paid to the members of the class represented. It is also like Wilder in that, if plaintiffs won, they would get money.
 
 
 88
 By contrast, in the case at bar, if the nominal clients asked their lawyers what was in it for them if they won, their lawyers would have to tell them that win or lose, they could not be assured of any money. Their lawyers ask for a declaratory judgment that Arizona is not in "substantial compliance," and an injunction requiring "affirmative measures sufficient to achieve as well as sustain substantial compliance." They seek attorneys' fees, but no money for their clients.
 
 
 89
 Even if the plaintiffs won, and even if the district judge or special master turned out to be a far better administrator of the child support enforcement division than the state Attorney General, no particular custodial parent could be assured of a dollar more than he or she gets now. A substantially complying child support enforcement unit would still fail to collect from a noncustodial parent who could not be located, or who was dead, unable to pay, or successful in avoiding collection attempts. Most of us who, as attorneys, have attempted collection work for clients have sometimes failed, and few of us have collected 100% of the money due 100% of the time.
 
 
 90
 The clients in this litigation provide a platform on which their lawyers can stand to have their voices heard in the administrative decisionmaking for the agency, and to collect attorneys' fees. This is what legal services lawyers call "impact litigation," designed to change social policy, not to get something for a client. Cf. Snake River Farmers Assn. v. Department of Labor, 9 F.3d 792, 798 (9th Cir.1993). By contrast, in the First Circuit case, if the very poor clients asked "what's in it for me if we win," the lawyers could say "$50, right away, for each of you." Likewise, in Wilder, the lawyers could tell their clients that if they won, they would get higher fees.
 
 
 91
 The absence of any assured private benefit from the remedy suggests that no private remedy was intended by Congress. Compare the proposition, in the law of standing, that "it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.' " Lujan v. Defenders of Wildlife, 504 U.S. 555, 559-61, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). Suter says that "the burden is on respondents to demonstrate that Congress intended to make a private remedy available." Suter, 503 U.S. at 363, 112 S.Ct. at 1370. Wilder says that a person can sue under Sec. 1983 unless that statute does not create an enforceable right under Sec. 1983, as where "the interest the plaintiff asserts is 'too vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.' " Wilder, 496 U.S. at 509, 110 S.Ct. at 2517. Where the lawsuit would not produce a probable concrete benefit for the plaintiff, we can infer that Congress did not create a private right of action for that plaintiff. This factual distinction distinguishes Suter from Wilder in a manner which makes sense of both cases.
 
 
 92
 Plaintiffs' lawyers do not, in their complaint, ask for an award of money to their clients. Instead, they ask for a "declaratory judgment determining that operation of the Arizona Title IV-D program violates controlling substantive provisions of federal law creating rights," and for a permanent injunction with continuing supervision to bring about substantial compliance.
 
 
 93
 Plaintiffs did not sue the Secretary, and claim that she is not performing her duty to muscle the state into substantial compliance. Yet Congress gave to the Secretary, not the courts, the authority and discretion to decide whether state governments were substantially complying, and to negotiate plans to bring them into substantial compliance if they were not. Inferring a private right of action, as the majority opinion does, subverts this scheme, and gives the district courts power parallel or superior to the Secretary's to supervise state child support enforcement divisions. Congress established a political process, not a judicial one, to manage this administrative task.
 
 
 
 [1]
 The reimbursement rate ranges from 66-90%. General operating expenses are reimbursed on the following scale: 70% for fiscal years 1984-87, 68% for fiscal years 1988-89, and 66% for fiscal year 1990 and each following fiscal year. See 42 U.S.C. Sec. 655(a)(2). Prior to fiscal year 1984, states were reimbursed at a rate of 75%. State expenditures related to an automatic data processing and information retrieval system or related to laboratory costs incurred in establishing paternity are reimbursed at a rate of 90%. See 42 U.S.C. Sec. 655(a)(1). The Secretary has promulgated regulations for determining exactly which state expenditures are reimbursable. See 45 C.F.R. Sec. 304.20
 
 
 [2]
 A corrective action plan sets forth the steps necessary to achieve substantial compliance with the Title IV-D requirements. See 45 C.F.R. Sec. 305.99. Even though the Secretary approves a CAP, this is no guarantee that the state will be found in substantial compliance in subsequent audits
 
 
 [3]
 The internal audit documented a host of problems in the Arizona program. Among other deficiencies, the auditor noted that regular support payments were received in only 3% of the approximately 275,000 cases assigned to DCSE, and only 25% of these cases even have a valid support order established. Because of the widespread system problems, as of 1992, Arizona's Title IV-D program had failed to collect hundreds of millions of dollars in delinquent child support payments
 
 
 [4]
 These stories are outlined in detail in the plaintiffs' original complaint. Because of the posture of this case, we accept all of the alleged facts as true
 
 
 [5]
 See Carelli v. Howser, 923 F.2d 1208 (6th Cir.1991)
 
 
 [6]
 Plaintiffs also argue that HHS oversight does not evidence congressional intent to foreclose a Sec. 1983 action; that the district court's failure to grant any relief violates ordinary principles of equity jurisdiction; and that Carelli is factually inapposite to their case
 
 
 [7]
 There have been two Ninth Circuit cases involving private suits and Title IV-D. Barnes v. Healy, 980 F.2d 572 (9th Cir.1992) involved custodial parents challenging California's child support enforcement program. However, that class action involved procedural due process claims, and the issue of enforceable statutory rights was not addressed
 Vanscoter v. Thompson, 920 F.2d 1441 (9th Cir.1990) involved a class action brought by AFDC recipients challenging federal regulations and state practice relating to notice and disbursement of "pass-through" payments. The court never stated whether the suit was brought under the APA, Sec. 1983, or directly under Title IV-D. At least one of the plaintiffs' claims was based on due process grounds. Id. at 1450. In any case, the issues discussed here were neither raised nor addressed.
 
 
 [8]
 The Court was careful to note that an analysis of whether a statue is enforceable under Sec. 1983 and whether it is enforceable through an implied right of action are two separate and distinct inquiries. 496 U.S. at 508 n. 9, 110 S.Ct. at 2517 n. 9. The inquiry into whether an implied right of action exists is governed by the four-factor Cort v. Ash test. As the Court's discussion shows, it is generally more difficult to establish an implied right of action than it is to establish the availability of a Sec. 1983 action
 
 
 [9]
 Section 303.3(b)(1) identifies "appropriate location sources." These include the Federal Parent Locator Service, officials administering various public assistance and social welfare programs, relatives and friends of absent parent, the local telephone company, U.S. postal service, unions, fraternal organizations, police records, parole records, probation records, various state departments handling income taxation, driver's licenses, and vehicle registration
 
 
 [10]
 Notably, the standard for intended beneficiary under Sec. 1983 is somewhat broader than that under an implied right of action. For purposes of an implied right of action, the plaintiff must demonstrate that he is a member of a class for whose "especial benefit the statute was enacted." Cort v. Ash, 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26 (1975). This means that protection of the plaintiff's class must have been the primary concern of the legislation rather than a secondary or ancillary consideration. Id. at 80, 95 S.Ct. at 2089-90. In contrast, for purposes of Sec. 1983, multiple statutory beneficiary classes may exist and plaintiff's group need only fit in one of those beneficiary classes. Cf. Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (NLRA creates several classes of federal rights enforceable in Sec. 1983 action). See also Carelli, 923 F.2d at 1211 (noting that a statute may have more than one class of beneficiaries and this does not preclude Sec. 1983 enforcement)
 There are more stringent requirements for implied rights of action because judicially constructed implied rights of action raise separation of powers concerns not implicated by Sec. 1983. See Wilder, 496 U.S. at 508 n. 9, 110 S.Ct. at 2517 n. 9. Congress controls the availability of remedies for violations of statutes, and Sec. 1983 provides an express congressional authorization of private actions. Id.
 
 
 [11]
 The district court's reading of Carelli is not the only possible one. A reasonable alternative reading of the case is that a Sec. 1983 action is not precluded in every Title IV-D case, but rather that on the facts presented there, the action should not be allowed to proceed. A later Sixth Circuit decision has construed Carelli as barring the action because "the Carelli plaintiffs, in particular, failed to state a cognizable claim because they made 'no attack on the applicable regulations,' and alleged 'no acts of non-compliance beyond those already unearthed' by the Secretary." Wood v. Tompkins, 33 F.3d 600, 612 n. 23 (6th Cir.1994)
 As the plaintiffs point out, such a basis for barring the claim comes dangerously close to an unauthorized and perhaps inappropriate species of abstention. However, we need not explore the full ramifications of such a construction of Carelli because it is clear that the district court here relied on a construction of Carelli that focused on the comprehensive enforcement scheme. See Order at 4,7. This was also the construction offered by the State at oral argument.
 
 
 [12]
 Pass-through payments are regulated under Title IV-D. Gap payments are the difference between a family's predetermined level of need and the amount received from the state in AFDC. Under Title IV-A regulations, a state is required to fill this "gap" with money it collects through its Title IV-D program
 
 
 [13]
 A similar argument was rejected in Rosado. Although the Court viewed "with concern" the "escalating involvement of federal courts in [the] highly complicated area of welfare benefits," the Court found that this was not sound reason for concluding that judicial relief in these areas was unavailable. 397 U.S. at 423, 90 S.Ct. at 1223. As the Court explained:
 "It is ... peculiarly part of the duty of this tribunal, no less in the welfare field than in other areas of the law, to resolve disputes as to whether federal funds allocated to the States are being expended in consonance with the conditions that Congress has attached to their use."
 Id. at 423, 90 S.Ct. at 1223.
 
 
 [14]
 Moreover, such a resolution of the case would be premature at best. The district court cannot properly balance the equities when there is no adequate factual record on which to do so. The defendants attempt to obscure the lack of a sufficient factual record by pointing to the corrective action plan it submitted with its motion to dismiss and listing a multitude of steps the state was promising to take to improve its Title IV-D program. As the plaintiffs point out, there was no evidence before the court that the plans were in fact being implemented, the corrective action plan relied on by the defendants was due to expire six weeks prior to the district court's judgment, and there was no evidence before the court that the CAP had been successfully implemented. In fact, the state's internal audit (initiated after the last HHS audit before the court) suggested that no significant improvement in the state's implementation of its program had been made
 
 
 [1]
 Under 42 U.S.C. Sec. 652(a), the Secretary has the duty to establish a unit in the Department of Health and Human Services to perform the following tasks, among others:
 (1) establish such standards for the State programs for locating absent parents, establishing paternity, and obtaining child support and support for the spouse (or former spouse) with whom the absent parent's child is living as he determines to be necessary to assure that such programs will be effective;
 (2) establish minimum organizational and staffing requirements for State units engaged in carrying out such programs under plans approved under this part;
 (3) review and approve plans for such programs;
 (4) evaluate the implementation of State programs established pursuant to such plan, conduct such audits of State programs established under the plan approved under this part as may be necessary....
 (5) assist States in establishing adequate reporting procedures....
 (6) maintain records of all amounts collected and disbursed under programs established pursuant to the provisions of this part and of the costs incurred in collecting such amounts;
 (7) provide technical assistance to the States to help them establish effective systems for collecting child and spousal support and establish paternity;
 (8) receive applications from States for permission to utilize the courts of the United States to enforce court orders for support against absent parents and, upon a finding that (A) another State has not undertaken to enforce the court order of the originating state against the absent parent within a reasonable time, and (B) that utilization of the Federal courts is the only reasonable method of enforcing such order, approve such applications.