Mollie KING, et al., Plaintiffs,

v.

Philip C. BRADLEY, et al., Defendants.

No. 92 C 1564.

United States District Court,
N.D. Illinois, E.D.

Aug. 9, 1993.

Bridget Arimond, John Mark Bouman, Joan S. Colen, Mary E. Hurley, Denice Wolf Markham, Legal Assistance Foundation of Chicago, Chicago, IL, for plaintiffs.

James C. Stevens, Jr., Barbara L. Greenspan, Illinois Atty. General's Office, Chicago, IL, for defendants.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

Plaintiffs, Mollie King, Bobby Dunbar, Sharon Murphy, and their children, are clients of Illinois' Title IV–D child support enforcement program. They are seeking to bring a class action under 42 U.S.C. § 1983 to enjoin defendants, Philip Bradley, Director of Illinois Department of Public Aid ("IDPA"), and Isabel Blanco, Acting Administrator of the IDPA's Division of Child Support Enforcement ("DCSE"), to comply with the statutory requirements of the Child Support Enforcement Act ("Title IV–D"), 42 U.S.C. § 651, et seq., and with regulations promulgated by the Secretary thereunder. Plaintiffs seek to represent a class of all Cook County residents who have been, are, or will be clients of Illinois' IV–D program and "obligees under judicial child support orders with respect to which required payments have not been, are not being, or will not be collected from the obligors." Plaintiffs allege that defendants have a "custom and practice" of failing to operate Illinois' Title IV–D program in compliance with federal law. Plaintiffs specifically allege that defendants have a custom and practice of failing to:

(1) serve orders for withholding on obligors' employers in cases involving child support orders entered on or after November 1, 1990 and in which there are immediate orders for withholding;

(2) serve Notices of Delinquency on obligors for months and even years in cases involving child support orders entered before November 1, 1990 and in which the obligor's wages were not subject to immediate withholding;

(3) take the necessary further action to implement withholding within 25 days after serving the Notices of Delinquency on obligors in cases in which the obligors do not file a Petition to Stay Service within 20 days in cases involving child support orders entered before November 1, 1990 and in which the obligor's wages were not subject to immediate withholding;

(4) resolve disputes and take the necessary steps to implement withholding within 45 days of serving the Notices of Delinquency on the obligors in cases in which the obligors do file a Petition to Stay Service within 20 days in cases involving child support orders entered before November 1, 1990 and in which the obligor's wages were not subject to immediate withholding;

(5) use court time effectively by sending obligors Notices of Delinquency and following applicable state law;

(6) take any action to enforce child support; and

(7) locate the obligor's physical whereabouts and/or sources of income or other assets on a quarterly basis in the absence of new information.

Each named plaintiff also claims to have been individually injured by defendants' failure to comply with federally required procedures. Plaintiffs King and Dunbar, through services provided under the Title IV–D program, obtained court orders on April 25, 1989, and September 1, 1989, respectively, for immediate withholding of child support payments. King does not receive AFDC

benefits and is a "non-assistance" IV–D client. The father of each plaintiff's child was identified and employed, and each father's employer was known to defendants. As of April 22, 1992, the defendants had failed to serve withholding orders on either father's employer. King claims, as a result, to have lost the full amount of monthly child support payments to which she was entitled as a "non-assistance" client. Dunbar claims, as a result, to have lost the $50 pass-through to which she was entitled.

Plaintiff Murphy obtained a conditional income withholding order against Dwight Ballinger on October 29, 1987. As of April 22, 1992, defendants had not taken steps to obtain or serve an immediate income withholding order despite the fact that Ballinger has never made any scheduled support payments. Murphy claims to have lost the $50 pass-through as a result.

Defendants have filed a motion to dismiss both for lack of subject matter jurisdiction, FRCP 12(b)(1), and for failure to state a claim upon which relief may be granted, FRCP 12(b)(6). Defendants contend that this court lacks subject matter jurisdiction because plaintiffs lack standing. Alternatively, they argue that no actionable ·claim exists because Title IV–D does not create an enforceable right for purposes of § 1983.

On reference from this judge, the Magistrate Judge issued a Report and Recommendation recommending that defendants' motion be granted. Plaintiffs have objected to that recommendation and to the Magistrate Judge's recommendation that their motion for class certification be denied.

### The Statutory Framework

Title IV–A of the Social Security Act, Aid to Families with Dependent Children ("AFDC"), 42 U.S.C. § 601, et seq., is a federal state public assistance program that provides cash assistance and other benefits to needy dependent children and the caretaker relatives or guardians with whom they live. State participation in the program is voluntary, but States that choose to participate in AFDC are required to have a child support enforcement program in effect that complies with the requirements of Title IV–D. 42 U.S.C. § 602(a)(27). Services provided by the Title IV–D program are available not only to AFDC families, but also to families that do not currently receive (42 U.S.C. § 657(c)), or who may never have received (42 U.S.C. § 654(6)), AFDC benefits. Illinois participates in the AFDC program and operates a Title IV–D child support enforcement program. Illinois' Title IV–D program is overseen by IDPA and is administered by DCSE.

Among other things, Title IV–D programs are required to establish child support obligations by court or administrative order, to collect and distribute support payments, and to enforce support orders. 42 U.S.C. § 654(4), (6), (8). In Illinois, Title IV–D clients may choose to procure either an order for immediate income withholding or a conditional order for income withholding in the event the obligor defaults on payments. SHA 750 ILCS 5/706.1(B)(1). An obligor under a conditional order who fails to make a monthly payment within 30 days is served with a Notice of Delinquency ("NOD"). SHA 750 ILCS 5/706.1(C)(1). The obligee then files an affidavit which states that an NOD was served on the obligor and the obligor did not file a Petition to Stay. SHA 750 ILCS 5/706.1(E)(1). The Court can then issue an order for immediate income withholding. SHA 750 ILCS 5/706.1(E)(2). According to federal regulations, DCSE must serve an immediate income withholding order on the obligor's employer within 25 days of the date that an NOD was sent to the obligor. 45 CFR § 303.100(d)(2); SHA 750 ILCS 5/706.1(D)(1); SHA 750 ILCS 5/706.-1(K)(3).

Support payments collected by DCSE are distributed to clients in the following manner. Title IV–D clients who are not receiving AFDC benefits receive the full payment. 42 U.S.C. § 657(c); 45 CFR § 302.51(e). Title IV–D clients receiving AFDC benefits are entitled to a "pass-through" of the first $50 of each timely monthly payment. 42 U.S.C. § 657(b)(1); 42 U.S.C. § 602(a)(8)(A)(vi); 45 CFR § 302.51(b)(1). IDPA retains the remainder of the monthly payment to reimburse AFDC for benefits distributed to the client presently or in the past. 42 U.S.C. § 657(b)(2); 45 CFR § 302.51(b)(2. If the

monthly payment minus the $50 pass-through exceeds the amount of the total monthly AFDC benefit, the client also receives the excess amount. 42 U.S.C. § 657(b)(3); 45 CFR § 302.51(b)(3). However, DCSE may retain the excess amount to reimburse AFDC funds paid to the client in the past. 42 U.S.C. § 657(b)(4); 45 CFR § 302.51(b)(4), (b)(5).

### Standing in suits brought under § 1983.

■ When a motion to dismiss is brought both for lack of subject matter jurisdiction under Rule 12(b)(1) and for failure to state an actionable claim under Rule 12(b)(6), the Rule 12(b)(1) motion is addressed first. *Winslow v. Walters*, 815 F.2d 1114, 1116 (7th Cir.1987). Here, the 12(b)(1) motion is brought on grounds of lack of standing, so it must first be decided whether plaintiffs have standing to bring this suit.

■ Article III of the United States Constitution limits federal courts to adjudication of actual "cases" and "controversies." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 469, 102 S.Ct. 752, 757, 70 L.Ed.2d 700 (1982). An actual case or controversy exists only if the plaintiff has standing to bring suit, i.e., if the plaintiff has suffered a personal injury which is fairly traceable to the defendant's unlawful conduct and which is likely to be remedied by the requested relief. *Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). When, as here, the plaintiff brings suit under § 1983 to remedy the violation of a federal statute, the standing analysis must include a determination of whether the statute creates an enforceable right. The plaintiff cannot bring suit if the defendant can show either that the statute does not create an enforceable right or that Congress has foreclosed enforcement of the statute. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508, 110 S.Ct. 2510, 2517, 110 L.Ed.2d 455 (1990).

### Title IV–D creates an enforceable right.

■ An enforceable right exists when: (1) the statutory provision in question is intended to benefit the plaintiff, (2) the provision imposes a binding obligation on the state, and (3) the right is not so amorphous that courts are unable to adequately enforce it. *Wilder*, 496 U.S. at 508, 110 S.Ct. at 2517.[1]

First, Title IV–D is intended to benefit the plaintiffs. In *Mason v. Bradley*, 789 F.Supp. 273 (N.D.Ill.1992), the district court concluded that Title IV–D was intended to benefit AFDC families based on the existence of the $50.00 pass-through provision by which AFDC families receive the first $50.00 collected each month by a Title IV–D agency from a delinquent child support payer. 42 U.S.C. § 657(b)(1). Title IV–D also benefits non–AFDC family clients, such as King, who are entitled to receive the full amount of support payments collected.

The statement of purpose set out in § 651 of Title IV–D supports this conclusion. Section 651 states that the purpose of Title IV–D is to authorize appropriations of federal funds to state implementing agencies for "the purpose of enforcing the support obligations owed by absent parents *to their children* ... and assuring that assistance in obtaining support will be available under this part *to all children* for whom such assistance is requested." 42 U.S.C. § 651 (emphasis added). Legislative history also indicates that Title IV–D is intended to benefit children with absent parents:

> The Committee believes that *all children have the right to receive support from their fathers*. The Committee bill, like the identical provision passed by the Senate (H.R. 3153) last year, is designed to *help children* attain this right[.]

S.Rep. No. 93–1356, 93rd Cong., 2d Sess., reprinted in [1974] U.S.Code Cong. & Admin.News 8133, 8145–46 (beginning paragraphs of "Section IV. Child Support") (emphasis added).

---

1. The Supreme Court's decision in *Suter v. Artist M.*, —— U.S. ——, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992) casts some doubt on whether the *Wilder* framework was still valid. In a recent decision, the Seventh Circuit, following the First Circuit's decision in *Stowell v. Ives*, 976 F.2d 65 (1st Cir.1992), "synthesized" the "teachings of *Suter* with the Court's prior precedents." *Procopio v. Johnson*, 994 F.2d 325, 331, n. 9 (7th Cir.1993). This approach is used here.

Second, Title IV–D imposes a binding obligation on the State. In *Suter v. Artist M.,* — U.S. —, —, 112 S.Ct. 1360, 1366, 118 L.Ed.2d 1 (1992), the Supreme Court stated that when a statute is enacted by Congress pursuant to its spending power, Congress may impose conditions on a State's receipt of federal funds. The Court likened the relationship between the State and the federal government to that of parties to a contract. *Suter,* — U.S. at —, 112 S.Ct. at 1366 (citing with approval, *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 17, 101 S.Ct. 1531, 1540, 67 L.Ed.2d 694 (1981). A State is held to have accepted the "contract" and is bound by its terms, only if it is aware of the conditions Congress has imposed and is able to ascertain its obligations under the "contract." *Id.* Congress must therefore impose any conditions or obligations on which the grant of federal moneys depends in an unambiguous manner. *Id.* A condition or obligation is mandatory and binding if the grant of federal moneys is dependent on a State's compliance with a statutory provision. *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 510, 110 S.Ct. 2510, 2518, 110 L.Ed.2d 455 (1990).

In *Suter,* the Supreme Court found that Congress had not created a binding obligation under § 671 of Title IV–E, the Adoption Assistance and Child Welfare Act of 1980. In pertinent part, § 671 says, "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which [among other things] provides that ... reasonable efforts will be made ... to prevent or eliminate the need for the removal of the child from his home." 42 U.S.C. § 671(a)(15). Plaintiffs argued that the state was obligated under this section to make reasonable efforts. However, the Court held that this section imposed only the obligation "that the State have a plan approved by the Secretary which contains the ... listed feature[.]" *Suter,* — U.S. at —, 112 S.Ct. at 1367. In addition, the Court pointed out that the regulations promulgated by the Secretary to enforce Title IV–E did not place any conditions on the State's receipt of federal funds, "other than the requirement that the State submit a plan to be approved by the Secretary." *Suter,* — U.S. at —, 112 S.Ct. at 1369.[2]

Like Title IV–E, Title IV–D programs receive federal funding in the form of reimbursements for a percentage of state expenditures made during a quarter. 42 U.S.C. § 655. Federal funding for a Title IV–D program is reduced if "as a result of a review conducted under section 652(a)(4) [a state's program is found] not to have complied substantially with the requirements of [Title IV–D]." 42 U.S.C. § 603(h)(1). Section 652(a)(4) of Title IV–D authorizes the designee of the Secretary in charge of supervising State Title IV–D programs to conduct audits of the State program to ensure conformity with the requirements of Title IV–D, including the substantial compliance requirement. Under current regulations, "[f]or the purposes of ... section [603](h) of the Act, in order to be found to have an effective program in substantial compliance with the requirements of title IV–D of the Act, a State must meet the IV–D State plan requirements" in 75 percent of cases handled. 45 CFR § 305.20(d)(2). Echoing § 603(h)(1) of Title IV–A, the regulations further state that, "[i]f the Secretary finds, on the basis of the results of the audit ..., that a State's program does not substantially meet the requirements in title IV–D ..., total payments to the State under title IV–A of the Act will be reduced[.]" 45 CFR § 305.100. Unlike Title IV–E, therefore, a Title IV–D program's receipt of federal funds is unambiguously conditioned on the State's substantial compliance with federally required procedures, defined in current regulations as complying with required procedures in 75 percent of cases handled.

Finally, the right created under Title IV–D is not so amorphous that a court cannot enforce it. In *Suter,* the Court found that even if the "reasonable efforts" requirement of Title IV–E had been mandatory, it would have been too ambiguous to enforce because there was "[n]o further statutory guidance

**2.** The regulations promulgated pursuant to Title IV–E state in pertinent part, "[t]o be in compliance with the State plan requirements and to be eligible to receive Federal [funds], a State must have a State plan approved by the Secretary[.]" 45 CFR § 1356.20.

... as to how 'reasonable efforts' was to be measured." *Suter*, —— U.S. at ——, 112 S.Ct. at 1368. The *Suter* court distinguished its treatment of this clause from that accorded the "reasonable and adequate" rates clause of the Boren Amendment to the Medicaid Act in *Wilder*. That clause was not too amorphous to enforce because "the statute and regulations set forth in some detail the factors to be considered in determining the methods for calculating [reasonable and adequate] rates." *Suter*, —— U.S. at ——, 112 S.Ct. at 1368 (*distinguishing Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990)).

The right in this case is not too amorphous to enforce because the regulations set forth precisely the level of compliance necessary for a State program to be in substantial compliance with the statute.

The *Mason* court concluded that no enforceable right existed under Title IV–D because "there is no clear requirement that every applicant be provided with prompt child support services[.]" *Mason*, 789 F.Supp. at 277. It is true that a program which only requires procedures to be complied with in 75 percent of cases does not require that every client's case be handled in compliance with required procedures. However, the State is still under a binding obligation to operate a program which substantially complies with statutory and regulatory procedures, i.e., complies in 75 percent of cases.[3]

■■■ At the same time, no individual plaintiff or class of plaintiffs has an enforceable right or guarantee to be among the 75 percent of cases that must be handled in conformance with federally required procedures. In other words, as long as the State operates a Title IV–D program which substantially complies with federally required procedures, i.e., in 75 percent of cases, no individual who fails to receive services in conformance with federal regulations can sue to receive services which are in conformance with federal regulations, because the State is already meeting its binding obligation by

substantially complying. However, any plaintiff or class of plaintiffs that fails to receive services in compliance with federal regulations when the State is running a Title IV–D program which does not substantially comply with federal procedures does have the right to sue to enjoin the State to improve its level of conformance until it is in substantial compliance.

Plaintiffs claim that they have an enforceable right to more than substantial, or 75%, compliance. They argue that Part 305 regulations, which set out the 75% compliance requirement, govern only the audit process and do not define the level of compliance on which federal funding is conditioned. They contend that instead, Part 303 regulations governing "program operation" define the necessary level of compliance. Part 303 requires compliance with federal procedures "in all cases." 45 CFR §§ 303.2, 303.3, 303.5, 303.6. This argument ignores the *Suter*, *Wilder*, and *Pennhurst* decisions. Part 303 regulations do not create an enforceable right because compliance with Part 303 regulations is not a condition for receipt of federal funds. Furthermore, requiring compliance "in all cases" pursuant to Part 303 regulations would contradict the statutory language which requires only "substantial compliance," not strict compliance. 42 U.S.C. § 603(h)(1).

Plaintiffs also argue that courts have permitted suits brought to enforce specific provisions of the Medicaid Act despite the fact that only substantial compliance with those provisions was required under the Medicaid Act. They argue that because Title IV–D is analogous in structure to the Medicaid Act, suits to enforce Title IV–D's specific provisions ought to be permitted regardless of whether the State is substantially complying with federal requirements. However, plaintiffs have mischaracterized the cases which they cite to support this argument. The plaintiffs in each of the cited cases were not seeking enforcement of specific provisions of the Medicaid Act, but were alleging that a provision or procedure itself was either unfair or illegal. *Wilder v. Virginia Hospital*

---

3. The *Mason* court's decision was correct as applied to the facts in that case. The plaintiff in *Mason* was seeking to enjoin the State to follow required procedures in only her case. She was not seeking to enjoin the State to follow required procedures in at least 75 percent of cases.

*Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1992) (whether the state's method of reimbursing health care providers was reasonable and adequate); *Atkins v. Rivera,* 477 U.S. 154, 106 S.Ct. 2456, 91 L.Ed.2d 131 (1986) (whether the standard used to determine eligibility of the "medically needy" for Medicaid funds was sufficiently comparable to that used to determine eligibility of the financially needy); *O'Bannon v. Town Court Nursing Center,* 447 U.S. 773, 100 S.Ct. 2467, 65 L.Ed.2d 506 (1980) (whether residents of a recently decertified nursing home were entitled to participate in a hearing opposing decertification). Two other cases cited by plaintiffs, *Maher v. Roe,* 432 U.S. 464, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977), and *Beal v. Doe,* 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977), were equal protection cases which dealt with the fairness of existing provisions or procedures as applied to different classes, not with whether the procedures were being enforced. Plaintiffs here seek to enforce a level of compliance with existing procedures and do not question the fairness or legality of existing procedures. The cases cited simply do not support plaintiffs' position.

Plaintiffs also cite *Haskins v. Stanton,* 794 F.2d 1273 (7th Cir.1986). In *Haskins,* the Seventh Circuit upheld an injunction enforcing compliance with the prompt processing requirements of the federal Food Stamp program. However, as the Seventh Circuit pointed out, "the Food Stamp Act literally requires strict compliance with its provisions[.]" *Haskins,* 794 F.2d at 1277. The strict compliance requirement of the Food Stamp Act, guarantees that every client will receive services that conform to the Act's requirements, a guarantee not provided to Title IV–D clients.

### Congress did not intend to foreclose private enforcement of the right.

■ Having determined that an enforceable right exists under Title IV–D, the next question is whether Congress intended to foreclose private enforcement of that right under § 1983. Enforcement of a right is foreclosed where Congress has expressly precluded resort to § 1983 within the statute, *Wilder,* 496 U.S. at 519–20, 110 S.Ct. at 2523,

or where the statute "creates a remedial scheme that is 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983.'" *Wilder,* 496 U.S. at 521, 110 S.Ct. at 2523 (quoting *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 19, 101 S.Ct. 2615, 2626, 69 L.Ed.2d 435 (1981)). Title IV–D does not expressly preclude resort to § 1983. The question, therefore, is whether the remedial scheme provided under Title IV–D is sufficiently comprehensive to demonstrate that Congress intended to preclude § 1983 claims.

A court should not readily conclude that Congress has foreclosed a § 1983 remedy. *Wilder,* 496 U.S. at 519–20, 110 S.Ct. at 2523. The Supreme Court has only twice found that a statutory remedial scheme was sufficiently comprehensive to displace the § 1983 remedy, in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), and in *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984). *Wilder,* 496 U.S. at 519–20, 110 S.Ct. at 2523. In *Sea Clammers,* the Federal Water Pollution Control Act ("FWPCA") bestowed a considerable amount of enforcement power on the Environmental Protection Agency through the use of non-compliance orders, civil suits and criminal penalties. *Wilder,* 496 U.S. at 519–20, 110 S.Ct. at 2523. In *Robinson,* the Education of the Handicapped Act provided not only for administrative review, but also for ultimate judicial review. *Wilder,* 496 U.S. at 521, 110 S.Ct. at 2524. The Court has never found a remedial scheme sufficient to displace a § 1983 remedy where the statute merely provided for the withholding of approval of a state plan or the withholding of funds. *Wilder,* 496 U.S. at 519–23, 110 S.Ct. at 2523–2525. The only remedial measure provided under Title IV–D is a reduction in funding. This is insufficient evidence of Congressional intent to foreclose private enforcement of the right under § 1983.

### As the Complaint stands, plaintiffs lack standing to enforce the right under § 1983.

■ It still must be determined whether plaintiffs have standing to bring suit to en-

force the right created under Title IV–D. As stated earlier, a plaintiff has standing when the plaintiff has suffered a personal injury which is fairly traceable to the defendant's unlawful conduct and which is likely to be remedied by the requested relief. *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Each individual plaintiff must "allege a distinct and palpable injury to himself, even if it is an injury shared by a large class of other possible litigants." *Warth v. Seldin,* 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). See also, *Hope, Inc. v. DuPage County,* 738 F.2d 797 (7th Cir.1984).

In their Complaint, plaintiffs allege that defendants' failure to follow federally required procedures resulted in plaintiffs' injury of being directly deprived of either the full amount of child support payments or the $50 pass-through to which they are entitled. There is no question that deprivation of payments to which a plaintiff is entitled usually constitutes a cognizable injury. Under Title IV–D, however, plaintiffs are not entitled to any payments per se. Plaintiffs' enforceable right under Title IV–D is rather to receive services from a Title IV–D program which follows federally required procedures in at least 75% of cases.

In Plaintiffs' Reply Memorandum in Support of Plaintiffs' Motion for Class Certification, plaintiffs alternatively contend that they are injured by being deprived of a meaningful "opportunity" to receive child support payments. This statement of plaintiffs' injury conforms with the nature of plaintiffs' enforceable right under Title IV–D, which effectively gives each Title IV–D client a 75% chance or opportunity to receive services that comply with the statute and regulations and thereby receive child support payments. Case law also indicates that deprivation of an opportunity to receive a benefit is a cognizable injury for purposes of standing.

Plaintiffs cite several Supreme Court and lower court cases which held that an Article III injury existed in situations where the plaintiffs were found to have been denied an important opportunity to attain some ultimate result or benefit. Although the Supreme Court cases and the Seventh Circuit case relied on by plaintiffs do not directly support their argument,[4] other cited appellate court cases do support it. In *West Va. Ass'n of Community Health Centers v. Heckler,* 734 F.2d 1570 (D.C.Cir.1984), for example, appellant community health centers in the State of West Virginia challenged the formula employed by the Secretary of HHS to determine the total amount of federal funds received by the state for distribution to community health centers in that state. Both parties agreed that the state would receive substantially more funds if the challenge were sustained. However, the respondents contended appellants lacked standing because there was no guarantee that any individual health center would ultimately receive any funds from the state. The court disagreed saying, "once appellants demonstrated that they would qualify to receive these funds, they need not shoulder the additional burden of demonstrating that they are certain to receive funding." *Heckler,* 734 F.2d at 1576. See, also, *Internat'l Longshoremen's and Warehousemen's Union v.*

---

4. Plaintiffs cite *Village of Arlington Heights v. Metro. Housing Dev.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), *Regents of University of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) and *Planned Parenthood Ass'n of Chicago v. Kempiners,* 700 F.2d 1115 (7th Cir.1983). Although each of these cases supports plaintiffs' position that whether a plaintiff ultimately receives the benefit is irrelevant for standing purposes, none of these cases clearly recognized an injury in the mere denial of an opportunity to receive a benefit. In *Arlington Heights* and *Bakke,* the injury was the denial of an opportunity because of racially discriminatory actions or policies. In *Kempiners,* the injury was the denial of an opportunity to receive funds because abortion-related activities. In each case,

the injury lay in being denied an opportunity because of discrimination against a constitutionally irrelevant characteristic. Indeed, in a recent decision also submitted by plaintiffs, the Supreme Court clarified the nature of the injury recognized in *Arlington Heights* and *Bakke:* "[w]hen the government erects a barrier that makes it more difficult for members of one group to obtain a benefit than it is for members of another group, ... [t]he "injury in fact" ... is the denial of equal treatment resulting from the imposition of the barrier, not the ultimate inability to obtain the benefit." *Northeastern Florida Chapter of the Associated General Contractors of America v. City of Jacksonville,* —— U.S. ——, 113 S.Ct. 2297, 124 L.Ed.2d 586 (1993).

*Meese*, 891 F.2d 1374 (9th Cir.1989) (loss of opportunity to obtain longshore jobs, because INS decision resulted in fewer available jobs); *Committee for Full Employment v. Blumenthal*, 606 F.2d 1062, 1065 (D.C.Cir. 1979) (denial of government investigation of discrimination complaints is cognizable injury regardless of whether complaints are ultimately meritorious). Appellants in *Heckler* were injured because the total amount of funding received by the state was not as large as it legally should be. Plaintiffs in this case argue that they are injured because the total number of cases which DCSE handles in compliance with the Title IV–D statute and regulations is not as large as it legally should be. The situations are analogous.

Defendants seek to distinguish *Heckler* by characterizing the injury in that case as the denial of an opportunity to *compete* for a benefit. Since plaintiffs are not required to compete for child support services or payments, they argue, *Heckler* is inapplicable. Defendants are incorrect. The appellants in *Heckler* were neither denied the opportunity to compete for, nor the opportunity to apply for, funds as a result of the Secretary's actions. They were injured by "the sharp curtailment of their opportunities for funding." *Heckler*, 734 F.2d at 1576 (citing *Nat'l Assoc. of Neighborhood Health Centers v. Mathews*, 551 F.2d 321 (D.C.Cir.1976)). They were denied an opportunity to successfully *receive* funds, as are plaintiffs here.

Nevertheless, because plaintiffs did not allege this injury in their complaint, defendants' motion to dismiss must be granted. However, because plaintiffs' argument has merit, plaintiffs will be given an opportunity to amend their complaint. Plaintiffs should keep in mind that any "loss of opportunity" injury exists only insofar as DCSE fails to follow federally required procedures in less than 75 percent of cases. If DCSE is in substantial compliance with the statute and regulations, plaintiffs have not lost any statutorily granted opportunity.

### Conclusion

In summary, an enforceable right exists under Title IV–D and enforcement of that right has not been foreclosed by Congress. That right is to have a Title IV–D program that substantially complies with the requirements of the statute and regulations, i.e., complies in at least 75 percent of cases. The loss of opportunity to receive child support payments is a cognizable injury which would be directly caused by defendants' failure to operate a substantially complying Title IV–D program. That injury would be redressable by the court, and plaintiffs need not prove that they will ultimately receive child support payments. Although the complaint does not allege this claim for which plaintiffs would have standing, it may be possible to amend the complaint to allege the loss of an opportunity to receive child support payments resulting from defendants' failure to operate a Title IV–D program that substantially complies, i.e., in 75 percent of cases, with the statute and regulations. Thus, while the complaint will be dismissed, plaintiffs will be given an opportunity to amend it.

ORDERED: The Magistrate Judge's recommended decision is accepted in part and modified in part. Defendants' motion to dismiss pursuant to Rule 12(b)(1) is granted. Plaintiffs are granted leave to file an amended complaint on or before September 3, 1993.

The motion for class certification is denied without prejudice to plaintiffs filing another motion for class certification after the filing of an amended complaint.