Patricia DAVIS, Ella Larita Lillard, Patricia Northcutt, and Marietta Turner, on their own behalves and on behalf of all persons similarly situated, Plaintiffs–Appellees,

v.

Joyce McCLARAN, Director, Child Support Services, Tennessee Department of Human Services, Defendant–Appellant,

and

Victor S. Johnson, III, District Attorney General for the 20th Judicial District, and the Metropolitan Government of Nashville and Davidson County, Defendants.

Supreme Court of Tennessee,
at Nashville.

Oct. 30, 1995.

David A. Ettinger, Russell J. Overby, Legal Services of Middle Tennessee, Inc., Nashville, for plaintiffs–appellees.

Charles Burson, Attorney General and Reporter, Michelle L. Lehmann, Assistant Attorney General, Nashville, for defendant.

## OPINION

DROWOTA, Justice.

This case presents the question of whether individual plaintiffs may bring an

action against the Child Support Services Division of the Tennessee Department of Human Services (DHS) pursuant to 42 U.S.C. § 1983 to enforce their rights to child support services allegedly conferred by Title IV–D of the Social Security Act, 42 U.S.C. § 651 *et seq.* The Court of Appeals reversed the trial court's judgment denying the requested relief, holding instead that the plaintiffs were entitled to bring an action under § 1983 to force the State to "substantially comply" with the requirements of Title IV–D. Pursuant to the applicable regulations, a state Title IV–D agency is in "substantial compliance" if it follows specified procedures with regard to certain enumerated criteria in seventy-five (75%) of its child support cases. For the reasons that follow, we modify the Court of Appeals' holding and conclude that these and similarly situated individuals should be allowed to bring a claim under § 1983 for individual relief when the state violates its "direct obligations" under Title IV–D, even if the State is in "substantial compliance" with the requirements of the Act.

### FACTS AND PROCEDURAL HISTORY

The plaintiffs in this action—Patricia Davis, Ella Larita Lillard, Patricia Northcutt and Marietta Turner—allege that the Tennessee DHS has failed to provide them with child support services as required by Title IV–D.[1] Specifically, Davis, Lillard, and Turner allege that DHS has failed to assist them in enforcing existing child support obligations owed by the fathers of their respective children. Although it is not entirely clear from the complaint, Northcutt apparently alleges that DHS has failed to assist her in establishing a support obligation for her child. Citing an evaluation of the Title IV–D program performed by a private consulting firm, the plaintiffs allege that these failures are principally due to the fact that the Davidson County Child Support Program is grossly understaffed, as compared to other counties in the state. The plaintiffs seek injunctive relief under § 1983 for the deprivation of their alleged federal statutory rights; they also seek declaratory relief and a writ of mandamus.

After the plaintiffs filed their action, the trial court granted the defendants' motion to dismiss for failure to state a claim upon which relief could be granted. The trial court held that "the plaintiffs have no private right of action to enforce any rights allegedly arising under either Title IV–D and/or 42 U.S.C. § 1983." The trial court also concluded that "the plaintiffs have no clear, specific and undeniable rights which this court could enforce by a writ of mandamus or declaratory relief."

As noted above, the Court of Appeals reversed this judgment, holding that the plaintiffs could utilize § 1983 to force the state to "substantially comply" with the requirements of Title IV–D. The State then filed an application for permission to appeal pursuant to Rule 11, Tenn.R.App.P. We granted that application to consider this important issue, which has caused a split among the jurisdictions that have considered it.[2]

### STATUTORY BACKGROUND

Title IV of the Social Security Act is a federal-state cooperative venture that provides assistance to needy families who have been deprived of a parent through death, desertion or disability. 42 U.S.C. § 601–687.

1. Because DHS had contracted with Victor S. Johnson, III, the District Attorney General for Davidson County, and the Metropolitan Government of Nashville and Davidson County (Metro) to provide the services required by Title IV–D, the original complaint named these parties as defendants. However, during the course of this litigation the contract expired, thus mooting the claims against Johnson and Metro. The parties entered into agreed orders dismissing Johnson and Metro.

2. A number of jurisdictions, perhaps a slight majority, have held that relief is available under § 1983. *See Albiston v. Maine Com'r of Human Services,* 7 F.3d 258 (1st Cir.1993); *Howe v. Ellenbecker,* 8 F.3d 1258 (8th Cir.1993); *King v. Bradley,* 829 F.Supp. 989 (N.D.Ill.1993); *Behunin v. Jefferson County Dept. of Social Services,* 744 F.Supp. 255 (D.Colo.1990). Others, however, have denied relief on various grounds. *See Wehunt v. Ledbetter,* 875 F.2d 1558 (11th Cir. 1989); *Carelli v. Howser,* 923 F.2d 1208 (6th Cir.1991). For a good discussion of the issue, see Ashish Prasad, "Rights Without Remedies: Section 1983 Enforcement of Title IV–D of the Social Security Act," 60 *University of Chicago Law Review* 197 (1993).

Although participation in the direct aid portion of Title IV—Title IV–A, the Aid to Families with Dependent Children Program—is not mandatory, states choosing to participate and receive federal funds must, among other things, "provide that the State has in effect a plan approved under part D of this subchapter and operates a child support program in substantial compliance with such plan." 42 U.S.C. § 602(a)(27). Title IV–D provides a wide variety of child support services to needy families, as 42 U.S.C. § 651, its authorization of appropriations section, indicates:

> For the purpose of enforcing the support obligations owed by absent parents to their children and the spouse (or former spouse) with whom such children are living, locating absent parents, establishing paternity, obtaining child and spousal support, and assuring that assistance in obtaining support will be available under this part to all children (whether or not eligible for aid under part A of this subchapter) for whom such assistance is requested, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part.

As noted above, a participating state is required to submit a plan to the Secretary of Health and Human Services (HHS) and have that plan approved by the Secretary. The broad requirements for the plan are outlined in 42 U.S.C. § 654, and are further defined in the supporting regulations, found at 45 C.F.R. Part 302. The plan must, at a minimum, provide that it will be in effect in all political subdivisions of the state and that it will be administered by a single state agency (the Title IV–D state agency). 42 U.S.C. § 654(1), (3). The plan must also provide that child support services will be made available to any child for whom an application for assistance is filed. 42 U.S.C. 654(6). The agency must be adequately staffed to ensure the availability of services. 42 U.S.C. § 652(a)(2).

It is not sufficient, however, for the state merely to *have* an approved plan; it must also *operate* the program in compliance with the requirements of Title IV–D. The Secretary is required to conduct audits of the state Title IV–D programs at least once every three years in order to ensure this compliance. 42 U.S.C. § 652(a)(4). If the state is found to be out of compliance, the Secretary is authorized to withhold a certain percentage of federal funds unless the state submits a corrective action plan, in which case the reduction of funding may be suspended. 42 U.S.C. § 603(h).

In order to avoid the reduction in funding, the state must be in "substantial compliance with the requirements of title IV–D." 42 U.S.C. § 603(h), 604(a)(2). This term is defined in 45 C.F.R. 305.20:

> In order to have an effective program in substantial compliance with the requirements of title IV–D of the Act, a state must meet the IV–D State plan requirements contained in Part 302 of this chapter as measured as follows: ... For the fiscal year 1988 and future audit periods: (1) The criteria prescribed in paragraphs (a)(1), (b)(1), and (c)(1) must be met. (2) The procedures required by the criteria prescribed in paragraphs (a)(2), (b)(2), and (c)(2) of this section must be used in 75 percent of the cases reviewed for each criterion.

After defining "substantial compliance," Part 305 goes on to list certain general procedures that the state agency must follow for each criterion. The criteria at issue in this case, "[Establishment of] Support obligations" and "Enforcement of support obligation," are contained under paragraph (a)(2).

There is one final set of regulations applicable to state title IV–D programs. Part 303, which is entitled "Standards for Program Operations," prescribes "(a): [t]he minimum organizational and staffing requirements the state IV–D agency must meet in carrying out the IV–D program, and (b): [t]he standards for program operation which the IV–D agency must meet." Part 303 then sets forth detailed guidelines that the state IV–D agency "must" meet "for all cases" for several criteria, including: "establishment of cases and maintenance of case records," 45 C.F.R. § 303.2; "location of absent parents," 45 C.F.R. § 303.3; "establishment of support obligations," 45 C.F.R. § 303.4; "establishment of paternity," 45 C.F.R. § 303.5; and "enforcement of support obligations," 45

C.F.R. § 303.6. These guidelines, which are phrased in mandatory language and apply to all cases, are often much more specific and stringent than the general "procedures" applicable to the same criteria in Part 305.

### THE AVAILABILITY OF SECTION 1983

■■■ It is now well-settled that § 1983[3] is available to redress violations of federal law by persons acting under color of state law. *Maine v. Thiboutot,* 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). This availability is, however, subject to two important exceptions: (1) where the federal statute in question does not create an enforceable right, *Pennhurst State School and Hospital v. Halderman,* 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981), *Wright v. Roanoke Redevelopment and Housing Authority,* 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987); or (2) when Congress has foreclosed such enforcement of the statute in the statute itself. *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Smith v. Robinson,* 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984).

### A. THE ENFORCEABLE RIGHT EXCEPTION

In *Wilder v. Virginia Hospital Ass'n,* 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990), the United States Supreme Court synthesized its prior cases and formulated a three-part test for determining when a federal statute creates a right enforceable by § 1983.[4] The *Wilder* court stated that

Such an inquiry turns on [1] whether the provision in question was intended to bene-

fit the putative plaintiff. [2] If so, the provision creates an enforceable right unless it reflects merely a 'congressional preference' for a certain kind of conduct rather than a binding obligation on the government unit, unless [3] the interest the plaintiff asserts is too 'vague and amorphous' such that it is 'beyond the competence of the judiciary to enforce.'

*Wilder,* 496 U.S. at 509, 110 S.Ct. at 2517 (citations omitted).

■■ We have little difficulty concluding that plaintiffs have enforceable rights to Title IV–D benefits under the *Wilder* test.[5] First, while the State cites *Wehunt v. Ledbetter,* 875 F.2d 1558 (11th Cir.1989) for the proposition that Title IV–D was enacted for the exclusive purpose of reducing the welfare rolls and benefitting the public treasury, and that custodial parents and children are thus not the intended beneficiaries of the legislation, we believe, as do the great majority of other courts that have considered this issue,[6] that the plain language of the Act and its legislative history overwhelmingly prove otherwise. Initially, although parents receiving AFDC benefits are required to assign any child support benefits to which they are entitled to the state, 42 U.S.C. § 602(a)(26), those parents are nevertheless entitled to receive the first fifty ($50) dollars of any monthly support payments collected by the state, with no accompanying loss in AFDC eligibility. Also, parents who do not receive AFDC benefits are eligible to receive Title IV–D benefits, and are entitled to the full amount of child support collected by the state. 42 U.S.C. § 657(b)(4). These provisions suggest that Title IV–D was intended,

3. Section 1983 provides, in pertinent part:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or territory or the district of Columbia, subjects or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities, secured by the Constitution and laws shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."

4. The "enforceable right" exception has been dealt with by the Supreme Court since *Wilder* in *Suter v. Artist M.,* 503 U.S. 347, 112 S.Ct. 1360,

118 L.Ed.2d 1 (1992), a case in which the Court arguably reduced the scope of an enforceable right to a substantial degree. However, Congress recently has expressly disavowed the restrictive analysis employed in *Suter. See* Public L. 103–382, 108 Stat. 3518, 4057–58, reprinted in *December 1994 U.S.Cong. and Admin.News.* Therefore, we will not use the *Suter* opinion in this case.

5. The precise scope of these rights is another question. See THE SCOPE OF § 1983 AVAILABILITY, *infra.*

6. The courts that have rejected *Wehunt* include *Carelli, Albiston, Howe,* and *King.*

at least in part, to directly benefit custodial parents and their children. This conclusion is buttressed by the language of § 651, quoted above, and by the legislative history of the Act.[7] Therefore, we conclude that custodial parents and their children are beneficiaries of the Act, though perhaps not the sole beneficiaries.

The second prong of the *Wilder* enforceable rights test—the "binding obligation" prong—likewise appears relatively straightforward. The Supreme Court has stated that a federal statute will be considered a "binding obligation" of a state, rather than a mere "congressional preference" for action, if the state's receipt of federal funds is unambiguously conditioned upon its compliance with the statute. *Pennhurst*, 451 U.S. at 19, 101 S.Ct. at 1541. Here, the state is clearly required to "substantially comply with the requirements of Title IV–D"; and its failure to do so will subject it to a reduction of federal funding. Although the state may retain discretion in some areas of its program not covered by the regulations, we believe that this is a sufficiently binding obligation for purposes of the *Wilder* test.

Lastly, the *Wilder* test requires that the federal rights asserted by the plaintiff be sufficiently determinate so that the judiciary may competently enforce them. In prior Supreme Court cases, such as *Wilder* and *Wright,* this determination has turned upon whether the state's discretion in conferring the right was adequately channeled and guided by the statute or its implementing regulations so as to provide some standard by which to gauge the state's performance. Here, the regulations in Part 305, and even more so in part 303, which is more specific and stringent still, substantially channel the

state's discretion. Therefore, since the standards for gauging the state's performance are ascertainable, the plaintiffs' asserted rights are sufficiently determinate. This conclusion is supported by the fact that the Title IV–D regulations are much more detailed than those at issue in *Wilder* and *Wright.*

## B. THE FORECLOSURE EXCEPTION

■ The second major exception to the availability of § 1983 to enforce a federal right is when Congress has foreclosed the use of § 1983 in the statute itself. This foreclosure may occur in two ways: first, when Congress expressly precludes the use of § 1983 in the statute, *Wright,* 479 U.S. at 423, 107 S.Ct. at 770; or second, when the statute creates a remedial scheme that is "sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under § 1983. *Sea Clammers Ass'n,* 453 U.S. at 20, 101 S.Ct. at 2626.

■ The State concedes that Title IV–D does not expressly preclude resort to § 1983. However, it argues that the Secretary's authority to audit the state Title IV–D programs, coupled with its ability to withhold federal funding if the programs are discovered to be out of compliance, demonstrates that Congress intended that the Secretary, not the state or federal judiciaries, possess remedial authority over Title IV–D. The State relies heavily upon *Carelli v. Howser,* 923 F.2d 1208 (6th Cir.1991) to support this argument.

In *Carelli* the Sixth Circuit considered a § 1983 challenge to Ohio's Title IV–D program brought by custodial mothers. In its

---

**7.** Indeed, the following legislative history quoted by the *Wehunt* court just as readily supports our conclusion:

The problem of welfare in the United States is, to a considerable extent, a problem of the non-support of children by their absent parents. Of the 11 million recipients who are now receiving Aid to Families with Dependent Children (AFDC), 4 out of every five are on the rolls because they have been deprived of the support of a parent who has absented himself from the home.
*The Committee believes that all children have the right to receive support from their fathers.*

*The committee bill ... is designed to help children attain this right, including the right to have their fathers identified so that support can be obtained. The immediate result will be a lower welfare cost to the taxpayer but, more importantly, as an effective support collection system is established fathers will be deterred from deserting their families to welfare and children will be spared the effects of family breakup.*
*Wehunt,* 875 F.2d at 1565, quoting S.Rep. No. 93–1356, 93rd Cong., 2d Sess., reprinted in *1974 U.S.Code Cong. and Admin.News* 8133, 8145–46 (emphasis added).

analysis of the "implicit foreclosure" issue, the Court first described in detail the Secretary's audit authority over the state programs. It then emphasized that the State of Ohio had been audited and found to be out of compliance; that it had submitted a corrective action plan; that a follow-up audit had revealed that the program was still not in compliance and that a reduction in funding had been assessed by the Secretary; and that a second corrective action plan was then underway. The Court then concluded that the Secretary's audit authority was sufficiently comprehensive to preclude reliance upon § 1983. It explained its conclusion as follows:

> Reduced to its simplest terms, plaintiffs seek a 'hurry-up' order from the federal court. Plaintiffs make no attack on the applicable regulations, and the Secretary is not even a party to this litigation. They allege no acts of non-compliance beyond those already unearthed in the Secretary's audit ... Plaintiffs do not allege that Ohio cannot or will not get its program in compliance ...
>
> Since the plaintiffs seek no monetary relief, there would be no particularized individual relief forthcoming if this lawsuit were to go forward. What we envision happening would be an order coming from the court directing the State of Ohio to increase staff size, do a better job of establishing priorities, and setting time limits for performing required tasks as well as responding to calls for service. In short, the court's order would address all the shortcomings the secretary has already ordered corrected.
>
> We concede that, for the short term, a court order might be more effective. After all, the Secretary just imposes a monetary penalty on the state treasury; the court could send recalcitrant state officials to jail! We are not convinced, however, that Congress intended the federal judiciary to occupy the same ground at the same time and in the same manner as the secretary, notwithstanding that the Secretary's corrective action might take longer. We are not suggesting that time is irrelevant. We note, however, that none of these plaintiffs is limited to waiting for the Sec-

retary to act. This is not like a case where the government promises a monthly stipend and then does not deliver. In such a case, an intended beneficiary either gets his stipend from the government as promised or not at all. Here, each member of the class has other legal remedies for securing enforcement of court orders, establishing parenthood, or obtaining whatever relief is sought. Although Title IV–D was adopted, at lest in part, to make sure that responsible parties were held to their obligations, there was no intent to supplant or preempt any private remedy available that would accomplish the same end.

*Carelli,* 923 F.2d at 1216.

We begin our analysis with a recognition of the historic importance of § 1983 as a means of redressing violations of federal rights by state actors, and thus we, like the Supreme Court, "do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy." *Smith,* 468 U.S. at 1012, 104 S.Ct. at 3468. First, we acknowledge that the concerns voiced by the *Carelli* court have some validity in a practical sense: confusion and uncertainty could result if the Secretary was attempting to remedy the Title IV–D program at the same time as the state or federal judiciary. Of course, these concerns do not strictly apply to the matter before us, as the record does not reveal that the Secretary has taken any action to remedy the staffing and performance problems that allegedly plague the Davidson County Child Support Office. Therefore, this case does not present the sort of immediate practical problems as did *Carelli,* and that case's persuasiveness is thereby diminished.

However, we also disagree with the *Carelli* court for a more fundamental reason. The Supreme Court has only twice held that Congress has implicitly precluded reliance on § 1983 by enacting comprehensive remedial schemes. In *Sea Clammers,* the Court held that the remedial scheme included in the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.,* evidenced a congressional intent to foreclose resort to § 1983. This remedial scheme granted the Environmental Protection Agency enforcement pow-

er via noncompliance orders, civil suits and criminal penalties; and it included two citizen suits provisions. Similarly, in *Smith*, the Supreme Court held that the detailed administrative scheme in the Education of the Handicapped Act, 20 U.S.C. § 1400 et seq., foreclosed reliance on § 1983 because it included local administrative review that culminated in a right to judicial review.

The common thread of *Sea Clammers* and *Smith* is that both Acts contained provisions for private enforcement of statutorily conferred rights. In stark contrast, Title IV–D provides no such provision for private enforcement by the beneficiaries of the legislation. Indeed, the Supreme Court's rejection in *Wilder* of a similar argument proffered by the State of Virginia with regard to the Medicaid Act is equally applicable here:

> The Medicaid Act contains no comparable provision for private judicial or administrative enforcement. Instead, the Act authorizes the Secretary to withhold approval of plans, or to curtail federal funds to states whose plans are not in compliance with the Act ... By regulation, the states are required to adopt an appeals procedure by which the individual providers may obtain administrative review of reimbursement rates....
>
> This administrative scheme cannot be considered sufficiently comprehensive to demonstrate a congressional intent to withdraw the private remedy of § 1983.

*Wilder*, 496 U.S. at 521–22, 110 S.Ct. at 2524. Because the Supreme Court decisions in this area have required some type of private remedy in order to manifest congressional intent to preclude reliance on § 1983, and because Title IV–D contains no such provision, we conclude that the Secretary's audit authority does not implicitly foreclose resort to § 1983.

### SCOPE OF SECTION 1983 AVAILABILITY

■ Because we have determined that Title IV–D creates enforceable rights in favor of custodial mothers and their children and that Congress did not intend to foreclose resort to § 1983, we therefore hold that plaintiffs may utilize § 1983 to redress violations of their Title IV–D rights by state actors. This general holding, however, leaves a very important issue unresolved: is the plaintiffs use of § 1983 limited to enjoining the state to "substantially comply" with the requirements of Title IV–D; or may the plaintiffs use § 1983 to obtain relief in their individual cases, regardless of whether the state is substantially complying? More specifically, is the plaintiff limited to suing the state for the purpose of forcing it to bring its program into substantial compliance, as defined in Part 305 of the regulations, which would not necessarily guarantee relief in an individual case; or does the plaintiff have a right, enforceable by § 1983, to receive child support services according to the specific, mandatory guidelines in the Act, such as those enunciated in Part 303?

As with the general § 1983 issue, this specific question has generated a split among the jurisdictions that have considered it. In *Albiston v. Maine Com'r of Human Services*, 7 F.3d 258 (1st Cir.1993), the First Circuit Court of Appeals considered a § 1983 action brought to compel the State of Maine to promptly distribute child support payments to families in accordance with the mandatory language of U.S.C. § 652(i) and its supporting regulations. In that case, Maine argued that "the statutory requirement of 'substantial' rather than 'total' compliance renders the state's ... obligation under the plan ambiguous in individual cases, and therefore unenforceable in a private action under 42 U.S.C. § 1983." The Court rejected this argument, reasoning that:

> More generally, however, the 'substantial compliance' required to avoid administrative penalties under [the statutory provisions and regulations] is independent of, and narrower than, the State's *direct obligation* to AFDC recipients. As the Ninth Circuit has stated, in an analogous context, '[t]he funding standard [of 'substantial compliance'] is not ... the measure of what the regulations require; it is intended to measure how great a failure to meet those requirements should cause funds to be cut off.'

*Albiston*, 7 F.3d at 266 (emphasis added). Because the mandatory requirements of Part 303 clearly constitute a "direct obligation" on

state Title IV–D agencies in the same way as § 652(i) and its supporting regulations, the *Albiston* court would allow plaintiffs to bring an action for individual relief in accordance with these regulations regardless of whether the State was substantially complying.

The opposite view on this issue has been taken by the District Court for the Northern District of Illinois in *King v. Bradley,* 829 F.Supp. 989 (N.D.Ill.1993). In rejecting the plaintiffs' argument that they had a right to individual relief, the *King* court stated:

> Plaintiffs claim that they have an enforceable right to more than substantial, or 75%, compliance. They argue that the Part 305 regulations, which set out the 75% compliance requirement, govern only the audit process and do not define the level of compliance on which the federal funding is conditioned. They contend that instead, the Part 303 regulations governing 'program operation' define the necessary level of compliance. Part 303 requires compliance with federal procedures 'in all cases.' This argument ignores the *Suter, Wilder* and *Pennhurst* decisions. Part 303 regulations do not create an enforceable right because compliance with Part 303 regulations is not a condition for receipt of federal funds. Furthermore, requiring compliance 'in all cases' pursuant to the Part 303 regulations would contradict the statutory language which requires only 'substantial compliance,' not strict compliance.

*King,* 829 F.Supp. at 994.

As previously noted, the Court of Appeals in this case effectively adopted the *King* rationale, holding that the plaintiffs could bring an action to force the state to substantially comply with the Part 305 regulations, but that the plaintiffs were not guaranteed to be within the class to which relief was granted. We conclude, however, that *King* is flawed on a number of grounds. First, *King* completely bypasses the question of the purpose to be served by Part 303 regulations if there is no mechanism whatsoever for enforc-

ing them. These regulations are very specific and phrased in mandatory terms; certainly they are far stronger than the open-ended "congressional preference" dealt with in *Pennhurst.* We find it inconceivable that these detailed regulations, which have the force of law, were passed by the Secretary as simply a non-binding "suggestion" to state Title IV–D agencies that they engage in certain operative practices. But under the *King* rationale, these regulations effectively become a dead letter, a result specifically condemned by the *Wilder* court when it stated: "[w]e reject that argument because it would render the statutory requirements of findings and assurances, and thus the entire reimbursement provision, essentially meaningless." *Wilder,* 496 U.S. at 514, 110 S.Ct. at 2519–2520.

There are other major problems with the *King* rationale. First, that decision totally ignores the fact that the compliance of state programs is judged on a state-wide, not a county-wide, basis. This is important, because the residents of a county with particularly acute problems in its child support program, as Davidson County is alleged to have, would receive no relief if the State could prove that its overall state-wide compliance rate was 75%. Finally, if we were to adopt the *King* rationale, a plaintiff could potentially bring an action to enforce substantial compliance, achieve a positive result at trial and on appeal, and still not be guaranteed to be among the class to which relief was granted. Thus, the very instigator of the action could conceivably be denied any relief. We cannot countenance such a perverse possibility, and therefore decline to adopt the *King* rationale.

To summarize, we hold that a plaintiff may bring an action pursuant to § 1983 to enforce the state's "direct obligations" to him or her under Title IV–D; and that this right is not dependent upon whether the State is in "substantial compliance" with the requirements of Title IV–D for purposes of the Secretary's audit.[8] The judgment of the Court of Ap-

---

**8.** Although the plaintiffs also request declaratory relief and a writ of mandamus, we agree with the Court of Appeals that § 1983 is an adequate remedy, thus obviating the need for a writ of mandamus, an extraordinary remedy; and that § 1983 provides a better and more efficient remedy than a declaratory judgment.

peals is therefore affirmed only insofar as it is consistent with this holding.

ANDERSON, C.J., and REID and BIRCH, JJ., concur.

CHARLES H. O'BRIEN, Special Justice, dissents with separate dissenting opinion.

CHARLES H. O'BRIEN, Special Justice, dissenting.

I dissent. Primarily, because the issues involved in this case have become moot. The suit was initiated by the plaintiff in the Chancery Court for Davidson County against Joyce McClaran, Director, Child Support Services, Tennessee Department of Human Services; and Victor S. Johnson, III, District Attorney General for the 20th Judicial District, and The Metropolitan Government of Nashville and Davidson County, seeking a declaratory judgment and injunctive relief to enforce plaintiffs rights under Title IV–D of the Social Security Act, 42 U.S.C. § 651 *et seq.*, and to assist in collecting child support.

In due course the Chancellor entered an order setting forth in pertinent part that the plaintiffs had no private right of action to enforce any rights allegedly arising under either Title IV–D and/or 42 U.S.C. § 1983. He further held that the plaintiffs had no clear, specific and undeniable rights which the court could enforce by writ of mandamus or declaratory relief. The complaint was dismissed.

Appeal was taken to the Court of Appeals. During the pendency of the appeal the contract expired between the State of Tennessee, Department of Human Services and the Metropolitan Government of Nashville and Davidson County and the District Attorney General for the Twentieth Judicial District. The parties entered into agreed orders dismissing as moot the claims against Metropolitan Government of Nashville and the District Attorney General. The Director of Child Support Services filed a motion for dismissal on similar grounds.

Subsequently, the Court of Appeals entered an order finding that the plaintiffs had alleged a right arising out of Title IV–D and 42 U.S.C. § 1983 and that this right was not dependent upon the expired contract. They denied the motion to dismiss the appeal. The Court of Appeal's order held in pertinent part:

> Any plaintiff or class of plaintiffs that fails to receive services in compliance with federal regulations when the state is running a Title IV–D program which does not substantially comply with federal procedure does have the right to sue and enjoin the state to improve its level of performance until it is in substantial compliance.

The Court of Appeals concluded that the remedial measures prescribed under Title IV–D were insufficient evidence of congressional intent to foreclose private enforcement of the right under 42 U.S.C. § 1983.

An application of the Director of Child Support Services for the State of Tennessee for permission to appeal to this Court was granted. This Court has now affirmed the position of the Court of Appeals in part, summarizing their judgment to hold that a plaintiff may bring an action pursuant to Section 1983 to enforce the state's "direct obligation" to him or her under Title IV–D and this right is not dependent upon whether the state is in "substantial compliance" with the requirements of Title IV–D for the purposes of the secretary's audit.

Metropolitan Government of Nashville and Davidson County as well as the District Attorney General for the Twentieth Judicial District have been dismissed from the case by mutual agreement. The Director of Child Support Services, Tennessee Department of Human Services has contracted with Maximus, Inc., effective 1 July 1993, to provide child support enforcement services for the citizens of Davidson County, pursuant to a five (5) year contract with the state. The staffing of the child support enforcement program of Davidson County has been increased over levels prevailing in November 1992, at the time the complaint in this case was filed. Insofar as this record is concerned there is no "direct obligation" to be enforced pursuant to Section 1983. The issue is moot.

With perhaps greater pertinence, the majority have preempted federal jurisdiction in this matter based on the assumption that a

slight majority of cases from other jurisdictions have held that relief is available under § 1983. The cases cited in the majority Opinion are so diverse, insofar as subject matter is concerned, as to make them totally devoid of any precedential value. For example, *Howe v. Ellenbecker*, 8 F.3d 1258 (8th Cir.1993), dealt with child support enforcement under Title IV–D of the Social Security Act in which officials of the South Dakota Office of Child Enforcement refused to enforce state court orders for child support at an Indian reservation because of jurisdictional barriers. *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990) involved the standards for reimbursement of nursing and intermediate care facilities. The Court held in substance that Congress did not foreclose enforcement of the Medicaid Act under § 1983 because the Act did not expressly preclude resort to the statute nor did it create a remedial scheme that was sufficiently comprehensive to demonstrate congressional intent to preclude § 1983 actions.

The child support provisions of Title IV–D of the Social Security Act as well as the AFDC Program [Title IV–A] of the Act have been amended frequently and profusely. In order to reach a valid conclusion on the questions under consideration in this case, issue specific cases must be consulted. The majority opinion holds that the plaintiffs' have enforceable rights to Title IV–D benefits under the *Wilder* test. The Opinion goes on to discuss two cases which deal directly with the problem at hand, *Wehunt v. Ledbetter*, 875 F.2d 1558 (11th Cir.1989) and *Carelli v. Howser*, 923 F.2d 1208 (6th Cir.1991), suggesting *Carelli* is among the cases which have rejected *Wehunt*. The basis for that suggestion is invalid. In *Carelli*, after a thorough examination of Title IV–A and IV–D of the Social Security Act dealing with aid to families with dependent children, and a plan for child support enforcement in compliance with Title IV–D, the court held that the plaintiffs failed to state a cause of action under 1983 in a suit to enforce provisions of the Social Security Act requiring states to adopt plans for child support enforcement in order to maintain eligibility for receipt of federal aid with dependent children funds

where they sought no monetary relief but only a "hurry up" order from federal court and, the mere fact that a given custodial parent's child support payments are delinquent does not necessarily mean that the state is derelict in its obligations under provisions of the Social Security Act requiring states to adopt plans for child support enforcement. The only mention of *Wehunt* in *Carelli* was to suggest that the *Wehunt* judgment was not broad enough.

> We disagree, at least in part, with the conclusion reached in *Wehunt*. The Court in *Wehunt* as do the parties here, seem to foreclose the possibility that the statute [Title VI–D] could have more than one class of beneficiaries. We see no reason to conclude that the statute must be read to protect needy families with children to the exclusion of protecting the public fisc or vice versa. It seems eminently reasonable that Congress intended both purposes to be served. Indeed, needy families have as much interest in the protection of the public fisc as anyone else.

In *Wehunt*, after an extensive and thoughtful analysis, the court specifically held, "Title IV–D does not create any enforceable right: it was not enacted for the "especial benefit" of AFDC families. A Title IV–D program operates under a separate legislative and regulatory framework than that of a Title IV–A program. Title IV–A provides funds from the public treasure (sic) to children in need. Title IV–D seeks to recover those funds and restore the Treasury balance by enforcement of support obligations owed by the absent parents of these children. The driving force behind the program is recovery of welfare payments and a parallel commitment to remove and keep families from the necessity of welfare dependence by establishing and enforcing support obligations. The legislative history indicates that in enacting Title IV–D Congress was primarily concerned with collecting child support in order to reduce the welfare rolls ... Title IV–D is also not a legal assistance program. AFDC recipients do not apply for nor request support enforcement services. They assign their child support rights to the state and are required to cooperate (unless

good cause for refusing to do so is determined to exist) in whatever legal action the state undertakes. By assigning their child support rights in return for the AFDC aid, they give the states the opportunity to recoup the financial drain imposed by the welfare system on the state and federal treasuries. As was its intent, as evidenced by the language of the statute and the legislative history, diminishing the welfare outlay benefits society as a whole. Consistent with that intent, we cannot hold that Title IV–D creates enforceable rights under *Pennhurst.*

The opinion in *Wehunt* has foreclosed the issue definitively. The United States Supreme Court has denied certiorari. 494 U.S. 1027, 110 S.Ct. 1472, 108 L.Ed.2d 609 (1990). The majority has fallen into error.